Paul K. Savage (7983)
Equity Law PLLC
5513 W. 11000 N. #532
Highland UT 84003
Telephone: (801) 691-2491
psavage@equitylawpllc.com

Matthew R. Howell (6571)
FILLMORE SPENCER, LLC
3301 N. University Avenue
Provo, Utah 84604
Tel: (801) 426-8200
mhowell@fslaw.com

Attorneys for Plaintiff

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ALPINE SECURITIES CORPORATION, | **COMPLAINT FOR TAX REFUND** |
| Plaintiff, | **(Jury Demanded)** |
| v. | |
| UNITED STATES OF AMERICA, | Case No. 2:21-cv-00683-DBB |
| Defendant. | JUDGE DAVID BARLOW |

Plaintiff Alpine Securities Corporation complains and alleges against Defendant

United States of America, as follows:

**NATURE OF THE ACTION**

1.     This is a civil action seeking refund of the payment of backup withholding penalties assessed against the plaintiff Alpine Securities Corporation under 26 U.S.C. § 3406.

**PARTIES**

2.     Plaintiff Alpine Securities Corporation ("Alpine" or the "Taxpayer") is a Utah corporation headquartered in Salt Lake City, Utah. Alpine is a self-clearing broker-dealer and has been registered with the SEC since 1984.

3.     Defendant is the United States of America acting by and through the Internal Revenue Service, U.S. Department of the Treasury.

**JURISDICTION AND VENUE**

4.     The Court has original jurisdiction over this suit under 28 U.S.C. §§ 1331 and 1346(a)(1).

5.     The Taxpayer having paid in full federal tax penalties for one quarter for each year, the Court has subject matter jurisdiction and supplemental jurisdiction over remaining issues.

6.     Pursuant to 28 USC § 1401, venue is proper in this Court because the Plaintiff resides within the Federal District of Utah.

**FACTUAL BACKGROUND**

7.     Plaintiff is a Utah-based United States clearing broker established in 1984 which provides routine clearing and trade processing services for "introducing" firms,

also known as "correspondent" firms (each of which is a separately registered broker-dealer), as well as self-clearing business for its direct customers.

8.      About 60-70% of Alpine's work during the periods in question came through five different correspondent firms, with the balance from Alpine's own non-broker customers.

9.      Each correspondent firm relationship was formed on a fully disclosed basis; that is, the scope of the limited services subcontracted to and to be performed by Alpine were disclosed to the customers of the correspondent firms.

10.     Alpine, as a clearing firm, entered into and executed a "Fully Disclosed Clearing Agreement" on February 26, 2009, with Scottsdale Capital Advisors ("Scottsdale"), which was to serve as the introducing firm for Scottsdale's customers. See Scottsdale Fully Disclosed Clearing Agreement, Ex. A. (the "Clearing Agreement").

11.     Alpine's and Scottsdale's Fully Disclosed Clearing Agreement provided that Scottsdale retained sole responsibility with regard to its customers for (1) complying with all applicable laws, regulations, and self-regulatory requirements regarding transactions and accounts, including anti-money laundering ("AML") obligations, (2) maintaining procedures to ensure compliance, and (3) knowledge of the customer, including "all essential facts" relating to each customer and their accounts. See id., at Sec. 4.1.4, 5.1-5.3 and 6.1-6.8, Ex. A. In the event of a failure to comply with those requirements, and if Alpine incurs liability based on those failures, Scottsdale is required to indemnify Alpine. Pursuant to this agreement, Scottsdale acted as an introducing

broker-dealer for transactions cleared through Alpine throughout the 2011 and 2012 tax years.

12.     As a clearing broker, the vast majority of the securities Alpine handled involved non-dividend and non-interest-bearing products.  Indeed, Alpine's market niche has always been dealing with so-called "Penny Stocks", which seldom involve dividend or interest-bearing products.  Accordingly, when Alpine filed its Form 945 returns for 2011 through 2013 in the Spring of 2014, they showed only a small of amount of interest and dividend withholding for these periods.

13.     Shortly after Scottsdale and Alpine entered into their Clearing Agreement, Scottsdale introduced its relatively new client named Gibraltar Global Securities Inc. ("Gibraltar"), and Scottsdale opened several accounts for Gibraltar at Alpine for Alpine to act as a clearing broker, although Scottsdale—as always under the Clearing Agreement—retained the principal brokerage relationship. Gibraltar provided a W-8BEN to Scottsdale which in turn forwarded the document to Alpine for its files. The W-8BEN and the accompanying articles of incorporation and registration materials showed Gibraltar was a Bahamian corporation.  (Exhibit B).

14.     Throughout 2011 and 2012, Scottsdale initiated numerous stock trades through Alpine's platform on behalf of Gibraltar, with the proceeds pooled in Gibraltar's cash accounts at Alpine.

15.     Similarly, throughout 2011 and 2012, Scottsdale requested periodic transfers from the Gibraltar cash accounts to one or more Gibraltar non-U.S. bank

accounts, such as the Royal Bank of Scotland, although the activity dwindled in the latter part of 2012.

16.     Alpine charged a modest per transaction fee for the trades undertaken on its trading platform without regard to the size of the transaction, and played no decision-making role in any Gibraltar transaction, other than reviewing Scottsdale's information regarding whether stocks were eligible to be traded and confirming that the parties from which Gibraltar originally acquired the securities did not trigger "red flags" for AML purposes.

17.     Unbeknownst to Alpine at the time, the SEC was investigating Gibraltar and eventually filed a complaint against it alleging various violations of the securities laws.  This filing did not happen until after the end of the relevant 2011-2012 tax periods that are the subject of this action.

18.     Presumably at the suggestion of the SEC, the Internal Revenue Service opened a lengthy audit of Alpine's Form 945 for the 2011 and 2012 tax years in connection with transactions related to Gibraltar.

19.     Throughout the process, Alpine agreed to multiple extensions of the statute of limitations to allow time for the lengthy audit and to allow extra time for a subsequent appeal.

20.     The audit process involved an in-depth review of every trade that involved Scottsdale's customer, Gibraltar, eventually narrowing down to the 2011 and 2012 tax years.  Alpine supplied tens of thousands of pages drawn from its Scottsdale client files, such as responding multiple times to the duplicative requests for a copy of Gibraltar's

W-8 BEN, and the AML files for every stock that Scottsdale supplied to Alpine, as clearing broker, bearing Gibraltar's name. Pouring through these materials over a couple of years, the auditors reviewed all available information regarding the parties from which Gibraltar acquired stocks and then simply pretended that all such parties were in fact Alpine's true customers, without respect to any of the actual arrangements in place.

21.     For all suppliers of stocks to Gibraltar, any ambiguity in the auditors' minds regarding the nationality of the supplier was resolved by applying a presumption rule in favor of those persons being U.S. persons.  Then, ignoring all statutory frameworks, the government simply proposed imposing a backup withholding obligation as if Alpine were dealing directly with such persons, that they were all U.S. taxpayers and that they failed to provide a Tax ID as required under 26 USC § 3406.

22.     False standards aside, the list of transactions compiled still includes parties who were not subject to U.S. withholding in any event because they were clearly foreign persons not subject to withholding or were themselves corporations. Regardless, for none of the transactions could Alpine predict what, if any, percentage of any specific transaction Gibraltar would remit to its customers to create a baseline on which withholding would attach.

23.     Eventually the IRS audit resulted in the issuance of a "30-day letter" with proposed changes alleging that Alpine had a duty to perform backup withholding on a given number of transactions involving Gibraltar, assuming thereby the dollar amounts for which the withholding would apply.

24.     In April of 2018, Alpine timely appealed the IRS's 30-day letter showing that it did not have a duty to do backup withholding on Gibraltar-related transactions for a variety of reasons under existing law.

25.     The Taxpayer heard nothing from IRS Appeals for more than a year, at which point Alpine's attorney was contacted by an IRS appeals officer.  The officer acknowledged that he had not begun to look at the case and knew nothing about it but that he needed another statute of limitations extension, even though the current deadline was still more than six months away.  The appeals officer was informed that another extension would be forthcoming, but within weeks of that communication, counsel learned that the case had already been closed by appeals as "unagreed".

26.     The Taxpayer subsequently received a letter (Exhibit C), date stamped August 06, 2019, which stated:

> Unfortunately, we were unable to reach an agreement on your case. The Backup Withholding as determined by Appeals will be assessed and you will receive a Notice and Demand for payment of the tax, and interest owed.
>
> If you would like to challenge our determination in court, you may file a complaint in the United States District Court or the United States Court of Federal Claims. If you decide to do this, you must first pay, at a minimum, for any one quarter and file a claim for refund of the tax. Once the claim for refund is denied or 6 months elapse without any action by the Service, you may initiate suit.

27.     This letter was sent without any discussion having occurred on the merits of Alpine's appeal, and—on information and belief—without the Appeals officer having actually "determined" anything, other than that the case was getting old in his inventory.

28.     The forecasted "Notice and Demand" letter from the IRS followed, and Alpine duly paid the required quarter for the tax years in question per the IRS instructions in order to enable a refund claim.

29.     The payment in the sum of $66,947.72 (check #78444) was mailed on or about September 3, 2019, representing the amount allegedly due for the 4th Quarter of 2012, and the check to the IRS cleared the taxpayer's bank shortly thereafter.

30.     After the check cleared Alpine's bank account, Alpine filed a refund request (Form 843), which was submitted in November of 2019.  (Exhibit D)

31.     In the meantime, the IRS quickly began collection activity (Exhibit E) and assigned the case to a Revenue Officer to begin collection activity against Alpine.

32.     Early in 2020, Alpine's counsel provided to that Revenue Officer a copy of the Refund requests with accompanying materials and requested the agent's assistance in following up on the status of the request.  After extraordinary effort, the agent reported that she was eventually able to find that the case had been received, but also reported that she could provide no information regarding when (or if) a decision might be forthcoming.

33.     Later, again with assistance of the Revenue Officer, a submission was made to the Taxpayers Advocates Office ("TAO"), once again submitting a copy of the refund request materials asking if they could facilitate movement in the matter. Although Alpine received no direct response to this TAO request, the revenue officer followed up and was told that the TAO could not provide any help.

34.     In order to prevent disruptive liens and levies from being applied to collect taxes that Alpine has formally disputed, Alpine also filed a Collection Due Process Appeal, which Alpine voluntarily withdrew in connection with the filing of this litigation.

35.     On information and belief, despite the many months and now years that have passed since Alpine protested the proposal in the IRS's 30-day letter in April of 2018, no one at the IRS has actually evaluated the merits of the Taxpayer's position; moreover, more than two years have passed since the Taxpayer paid the taxes required to initiate a refund request, and the IRS has failed to take action on the refund request submitted directly in 2019 and indirectly two other times (via the revenue officer and the TAO), to either accept or deny it.

## FIRST CLAIM FOR RELIEF
### (Tax Refund)

36.     Alpine incorporates herein all other allegations in this Complaint as though fully set forth herein.

37.     Pursuant to the "Notice and Demand" letter from the IRS, in September 2019, Alpine paid to the IRS $66,947.72 for 4th Quarter 2012 for backup withholding taxes, and filed for a refund of this same amount the following November.

38.     Formal notice of disallowance of Plaintiff's refund claim with respect to the 2011 and 2012 backup withholding taxes has not been issued by Defendant. Because six months have expired since the filing of Plaintiffs refund claim, Plaintiff may begin this suit under 26 U.S.C. §7422(a), pursuant to 26 U.S.C. §6532(a)(1).

WHEREFORE, Alpine prays for relief as described below.

## SECOND CLAIM FOR RELIEF
### (Declaratory Judgment)

39.     Alpine incorporates herein all other allegations in this Complaint as though fully set forth herein.

40.     Defendant has asserted that Alpine is legally required to pay backup withholding taxes based on its transactions with or on behalf of Gibraltar and/or Scottsdale during tax years 2011 and 2012 and demanded that Alpine pay such taxes.

41.     Alpine denies any such legal obligation.

42.     An actual, present, and justiciable controversy has arisen between Alpine and Defendant concerning this alleged legal obligation.

43.     Alpine seeks declaratory judgment from this Court that it has no legal obligation to pay backup withholding taxes related to its 2011 and 2012 transactions with or on behalf of Gibraltar and/or Scottsdale.

WHEREFORE, Alpine prays for relief as follows:

1.  Order requiring Defendant to refund Alpine the amount of $66,947.72, together with prejudgment interest at the legal rate;

2.  Grant Alpine declaratory judgment that Alpine is not obligated to pay backup withholding taxes based on its transactions with or on behalf of Gibraltar and/or Scottsdale for tax years 2011 and 2012;

3.  Grant Alpine its attorney fees and costs, and

4.  Such other relief as may appear to the Court to be just and equitable in the circumstances.

10

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Alpine hereby demands a jury

trial on all issues triable to a jury.

DATED this 19th day of November, 2021.

FILLMORE SPENCER LLC

/s/ Matthew R. Howell
Matthew R. Howell
3301 N. University Avenue
Provo, Utah 84604
Telephone: (801) 426-8200
mhowell@lfslaw.com

Paul K. Savage (7983)
Equity Law PLLC
5513 W. 11000 N. #532
Highland UT 84003
Telephone: (801) 691-2491
psavage@equitylawpllc.com

Attorneys for Plaintiff

# EXHIBIT A

# Exhibit A

# FULLY DISCLOSED CLEARING AGREEMENT

This Fully Disclosed Clearing Agreement (this "Agreement") is made and entered into as of the 26 day of February 2009, by and between Alpine Securities Corporation, a Utah corporation ("Alpine"), 440 East 400 South, Salt Lake City, Utah and Scottsdale Capital Advisors, a Arizona corporation ("Broker"), 7170 E McDonald Drive, Suite 6, Scottsdale, AZ 85253.

## 1.0   APPROVAL

This Agreement shall be subject to approval by the Financial Industry Regulatory Authority ("FINRA") and by any other self-regulatory organization vested with the authority to review or approve it. Alpine and Broker shall each submit the Agreement to the FINRA for approval. In the event of disapproval, the parties shall bargain in good faith to achieve the requisite approval.

## 2.0   AGREEMENT

From the date of this Agreement until the termination of this Agreement as provided for in Paragraph 22 hereof, Alpine shall carry the cash accounts of the customers of Broker introduced by Broker to Alpine, and accepted by Alpine, and shall clear transactions on a fully disclosed basis for such accounts, in the manner and to the extent set forth in this Agreement.

## 3.0   ALLOCATION OF RESPONSIBILITY

### 3.1   Responsibilities of the Parties.

Pursuant to NASD Rule 3230, responsibility for compliance with all applicable laws, rules, and regulations of the Securities and Exchange Commission ("SEC"), the NASD, the New York Stock Exchange ("NYSE"), and any other regulatory or self-regulatory agency or organization shall be allocated between Alpine and Broker as set forth in this Agreement. To the extent that a particular function is allocated to one party under this Agreement, the other party shall supply that party with information in its possession pertinent to the proper performance and supervision of that function.

### 3.2   Relationship with Customers.

Except as provided in Paragraph 27.11 of this Agreement, all customers receiving services pursuant to this Agreement shall remain customers of Broker. Alpine shall provide services under this Agreement to Broker only to the extent explicitly required by specific provisions contained in this Agreement and shall not be responsible for any duties or obligations not specifically allocated to Alpine pursuant to this Agreement. Broker shall enter into appropriate contractual arrangements with customers on its own behalf and such agreements shall make Broker, and not Alpine, responsible to customers for the provision of services. Broker shall not be deemed to be an agent of Alpine for any purpose, except to the limited extent expressly set forth in paragraph 9.1.8 of this Agreement, nor shall Alpine be deemed to have a fiduciary relationship with any of Broker's customers. Broker acknowledges that Alpine does not control the business or operations of Broker.

4.0     **REPRESENTATIONS AND WARRANTIES**

4.1     Broker. Broker represents and warrants that:

4.1.1   Corporation Duly Organized. Broker is a corporation duly organized, validly existing, and in good standing under the laws of the state of California.

4.1.2   Registration. Broker is duly registered and in good standing as a broker dealer with the SEC and is a member firm in good standing of the FINRA.

4.1.3   Authority to Enter into Agreement. Broker has all requisite authority, whether arising under applicable federal or state law or the rules and regulations of any regulatory or self-regulatory organization to which Broker is subject, to enter into this Agreement and to retain the services of Alpine in accordance with the terms of this Agreement.

4.1.4   Substantial Compliance with Rules and Regulations. Broker and each of its employees is in substantial compliance with, and during the term of this Agreement shall remain in substantial compliance with, the registration, qualification, capital, financial reporting, customer protection, and other requirements of every self-regulatory organization of which Broker is a member, of the SEC, and of every state to the extent that Broker or any of its employees is subject to the jurisdiction of that state.

4.1.5   No Pending Action, Suit, Investigation or Inquiry. Broker has disclosed to Alpine every action, suit, investigation, inquiry, or proceeding (formal or informal) pending or threatened against or affecting Broker, any of its affiliates, or any officer, director, or general securities principal or financial and operations principal of Broker, or their respective properties or assets, by or before any court or other tribunal, any arbitrator, any Governmental authority, or any self-regulatory organization of which any of them is a member. Broker shall notify Alpine promptly, but in any event within three business days, of the initiation of any such action, suit, investigation, inquiry, or proceeding that may have a material impact on the business or financial condition of Broker.

4.1.6   Current Form BD. Broker has filed a Form BD that is current and complete in all respects. Broker shall provide to Alpine a copy of its currently filed Form BD and shall provide a copy of any amendments thereto at the time that such amendments are filed.

4.2     Alpine. Alpine represents and warrants that:

4.2.1   Corporation Duly Organized. Alpine is a corporation duly organized, validly existing, and in good standing under the laws of the state of Utah.

4.2.2   Registration. Alpine is duly registered and in good standing as a broker dealer with the SEC and is a member firm in good standing of the FINRA.

4.2.3   Authority to Enter Agreement. Alpine has all requisite authority, whether arising under applicable federal or state law, or the rules and regulations of any regulatory or self-regulatory organization to which Alpine is subject, to enter into this Agreement and provide services in accordance with the terms of this Agreement.

4.2.4   Compliance with Registration. Alpine and each of its employees is in substantial compliance with, and during the term of this Agreement shall remain in substantial compliance with the registration, qualification, capital, financial reporting, customer protection, and other requirements of every self-

regulatory organization of which Alpine is a member, of the SEC, and in every state in which it conducts business.

## 5.0    ESTABLISHING AND ACCEPTING NEW ACCOUNTS

5.1    Acceptance of New Accounts.    Broker shall be responsible for opening and approving new accounts. The residential address of all new accounts shall only be in states in which Alpine is registered as a Broker/Dealer.

5.2    Maintenance of Account Information.    Alpine may rely without inquiry on the validity of all customer information furnished to it by Broker. Broker shall undertake a search to determine if the Broker's customer is listed on The Office of Foreign Assets Control ("OFAC") sanctioned list and Broker shall undertake an ongoing review of its customers through updated OFAC sanctioned lists.

5.3    Anti-Money Laundering Program.    Broker shall maintain an ("AML") program administered by an AML Compliance officer to assure compliance with the Bank Secrecy Act and the USA Patriot Act. Broker shall be responsible for compliance with the supervisory requirements in Section 15(b)(4) of the Securities Exchange Act of 1934, as amended, NASD Rule 3010 and similar rules adopted by any other regulatory or self-regulatory agency or organization, to the extent applicable.

## 6.0    SUPERVISION OF ORDERS AND ACCOUNTS

6.1    Responsibility for Compliance.    Broker shall be solely responsible for compliance with suitability, "Know Your Customer" rules and other requirements of federal and state law and regulatory and self-regulatory rules and regulations governing transactions and accounts. Possession by Alpine of surveillance records, exception reports, or other similar data shall not obligate Alpine to establish procedures for dealing with such material or to review or be aware of their contents. Alpine shall not be required to make any investigation into the facts surrounding any transaction that it may execute or clear for Broker or any customer of Broker.

6.2    Compliance Procedures.    Broker agrees to diligently supervise compliance with all applicable laws, rules, and regulations of the SEC, NASD and any other regulatory or self-regulatory agency or organization having jurisdiction over Broker through the use of a compliance manual and other written supervisory procedures. Broker shall review transactions and accounts to assure compliance with prohibitions against manipulative practices, sales of unregistered securities pursuant to Rule 144 of the Securities Act of 1933, insider trading and other requirements of federal and state law and applicable regulatory and self-regulatory rules and regulations to which Broker or its customer are subject. Without limiting the above, Broker shall be responsible for compliance with the supervisory requirements in Section 15(b)(4) of the Securities Exchange Act of 1934, as amended, NASD Rule 3010 and similar rules adopted by any other regulatory or self-regulatory agency or organization, to the extent applicable.

6.3    Knowledge of Customer's Financial Resources and Investment Objectives.    Broker shall comply with Rules 2310 and 2315 of the NASD or comparable requirements of similar rules of any other self-regulatory organization to which Broker is subject. Broker shall obtain all essential facts relating to each customer, each cash account, each order, and each person holding a power of attorney over any account, in order to assess the suitability of transactions when required by applicable rules, the authenticity of orders, signatures, endorsements, certificates, or other documentation, and the frequency of trading. Broker warrants that, to the best of its knowledge, it will not open or maintain accounts for persons who are minors or who are otherwise legally incompetent and that it will comply with NASD Rules 3050 and 3090 and other laws, rules, or regulations that govern the manner and circumstances in which accounts may be opened or transactions authorized.

6.4     Opening and Approving New Accounts.  Broker shall be responsible for opening and approving all new accounts.  The residential address of all new accounts shall only be in states in which Alpine is registered as a Broker/Dealer.   Alpine may rely without inquiry on the validity of all customer information furnished to it by broker.  Broker shall undertake a search to determine if broker's customer is listed on the Office of Foreign Assets Control ("OFAC") sanctioned list and broker shall undertake an ongoing review of its customers through updated OFAC sanctioned lists.

6.5     Furnishing of Investment Advice.  Broker shall be solely responsible for any recommendation or advice it may offer to its customers.

6.6     Discretionary Accounts.  Broker shall be solely responsible for obtaining customer approval for and supervising discretionary accounts.

6.7     Accounts of Employees of Member Organizations, Self-Regulatory Organizations, and Financial Institutions.  Broker shall give required notices and obtain required approvals of employers in each case in which a customer is an employee of a broker-dealer, a self-regulatory organization, or a financial institution.

6.8     Anti-Money Laundering ("AML") Program. Broker shall have an AML Program administered by an AML Compliance officer to assure compliance with the Bank Secrecy Act and the USA Patriot Act.

6.9     Compliance with Regulation S-P.  Broker and Alpine shall comply with all provisions of Regulation S-P ("Privacy of Consumer Financial Information").

7.0     **NO EXTENSION OF CREDIT**

7.1     No Margin Transactions.  Alpine shall not permit customers of Broker to purchase securities on margin and all transactions for a customer will be cash transactions.

7.2     Unsecured Debits or Unsecured Short Positions.  Alpine shall charge against the account of Broker an amount equal to the value of any unsecured debit or short position (on a "mark to market" basis) in a customer account if that position has not been promptly resolved by payment or delivery. Any remaining debit shall be charged against Broker's Deposit Account and be considered a claim against Broker pursuant to Paragraph 19 of this Agreement.

7.3     Trading in Stock Options. Broker shall not place any orders with Alpine for the purchase or sale of listed stock options.

8.0     **MAINTENANCE OF BOOKS AND RECORDS**

8.1     Stock Records.  Alpine shall maintain stock records and other prescribed books and records of all transactions executed or cleared through it in accordance with generally accepted practices in the securities industry.

8.2     Regulators' Reports and Records.  Broker shall prepare, submit, and maintain copies of all reports, records, and regulatory filings required of Broker by any entity that regulates it, including, but not limited to, copies of all account agreements and similar documentation obtained pursuant to paragraph 5.0 of this Agreement and any reports and records required to be made or kept under the Currency and Foreign Transactions Reporting Act of 1970, the Money Laundering Abatement and Anti-Terrorist Financing Act of 2001, the Bank Secrecy Act, the USA Patriot Act and any rules and regulations

4

promulgated pursuant thereto. To the extent that Alpine is required to prepare or submit any reports or records by any entity that regulates it, Broker shall cooperate in providing Alpine with any information needed in order to prepare such reports or records.

8.3     Audio Taping of Telephone Conversations. Broker understands that for quality control, dispute resolution or other business purposes, Alpine may record some or all telephone conversations between Broker and Alpine. Broker hereby consents to such recording and will inform its employees, representatives and agents of this practice. It is further understood that all such conversations are deemed to be solely for business purposes.

## 9.0     RECEIPT AND DELIVERY OF FUNDS AND SECURITIES

9.1     Receipt and Delivery of Funds and Securities.

9.1.1     Cashiering Functions. Alpine shall perform normal and reasonable cashiering functions for customer accounts introduced by Broker. These functions shall include receipt and delivery of securities purchased and sold; receipt and payment of funds owed by or to customers; and provision of custody for securities and funds. Broker shall provide Alpine with the basic data and documents that are necessary or appropriate to permit Alpine to perform its obligations under this Paragraph, including but not limited to copies of records documenting receipt of customers' funds and securities received directly by Broker. Such data and documents must be compatible with the requirements of Alpine's data processing systems.

9.1.2     Purchases. Broker shall be responsible for purchases made for customers until actual and complete payment has been received by Alpine. When payment is tendered to Alpine in the form of a check, Broker shall remain responsible until the check has been paid and the proceeds actually received and finally credited to Alpine (without any subsequent chargeback) by its bank. Alpine shall use due diligence in depositing any checks that it receives directly from customers of Broker.

9.1.3     Sales. Broker shall be responsible for sales until Alpine has received, in acceptable form, the securities involved in a transaction. If Alpine does not receive delivery of securities in an acceptable form, Alpine may buy-in all or part of the securities for the accounts of the customer of Broker or Broker.

9.1.4     When Issued and Delayed Delivery Transactions. In the case of the purchase or sale of securities on a "when issued" basis, and in the case of a purchase or sale where distribution or delivery is otherwise delayed, Broker shall remain responsible, as set forth in this Agreement, until necessary and satisfactory payment of funds or delivery of securities has been received by Alpine.

9.1.5     Funds and Securities Received by Broker. Broker shall promptly deposit with Alpine funds or securities received by Broker from its customers, together with such information as may be relevant or necessary to enable Alpine to record such remittances and receipts in the respective customer accounts.

9.1.6     Failure to Settle or Pay. In the event of a failure to timely deposit required funds or securities, Alpine may take appropriate remedial action. Without waiving or otherwise limiting its right to take other remedial action, Alpine may at its option charge interest at a rate of 1½% over the prime lending rate prevailing in Salt Lake City, Utah. Broker may pass such charges on to its customers but Broker remains responsible therefore until actually paid.

9.1.7     Settlement and Delivery. Broker shall obtain each customer's agreement to accept partial deliveries and to abide by other clearance arrangements as may be directed by any exchange or association. With respect to any settlements which involve the drafting of securities, draft charges, including interest expense, will be borne by Broker.

9.1.8    Dreyfus Money Market Funds. Any free credit balances resulting from the sale of securities or from cash deposits into Broker's customer accounts are not segregated and may be used in Alpine's business in accordance with federal securities laws. Upon Broker's request, free credit balances may be invested in a money market fund managed by The Dreyfus Corporation ("Dreyfus"), which is not under Alpine's control and is not FDIC or SIPC insured. Alpine may receive a fee for services it performs in respect to the Dreyfus money market funds.

9.2    Transfer of Securities and Accounts. Upon receiving written or oral instructions from Broker, or written instructions from a customer, Alpine shall make reasonable efforts to effectuate such transfers of securities or accounts as may be requested. With respect to requests to transfer securities or accounts from Alpine to another Broker/Dealer, Alpine shall charge the Broker's customer a service charge of $50.00. Whenever practicable, Alpine shall first notify the Broker before acting on a customer's written request.

9.3    Restricted and Control Stock Requirements. Broker shall be responsible for determining whether any securities held in Broker's or its customer accounts are restricted or control securities as defined by applicable laws, rules, or regulations. Broker is responsible for assuring that orders executed for such securities comply with such laws, rules, and regulations.

9.4    Payment of Dividends and Handling of Exchange or Tender Offers, Rights, Warrants and Redemptions. Whenever Alpine has been instructed to retain custody of the securities in any account, Alpine may hold the securities in the customer's name, the name of Alpine or its nominee or in the names of nominees of any depository used by Alpine. Alpine shall perform the services required in connection with holding the securities in custody in each account, including (1) collection and payment of dividends and interest; (2) transmittal and handling (through Broker) of tenders or exchanges pursuant to tender offers and exchange offers; (3) transmittal of proxy materials and other shareholder communications if Alpine is appropriately compensated; and (4) handling of exercises or expirations of rights, warrants and redemptions.

9.5    Corporate Action Requests / Soliciting Dealer Agreements. Broker requests and authorizes Alpine to execute as Broker's agent-in-fact any and all Soliciting Dealer Agreements for corporate actions involving securities or other interests held by Broker's customers on the books of Alpine. Alpine agrees to provide notice of the pending corporate action to Broker at its designated location. Alpine further agrees to collect and submit corporate action requests from Broker and submit them to the soliciting party in accordance with the instructions received from the soliciting party. Alpine agrees to use its best efforts to communicate corporate action information to Broker and, where applicable, Broker's customers, but shall not be liable for a) any delays in the communication of corporate action information or b) delays in the transmission of collected corporate action requests to the soliciting party unless caused by Alpine's gross negligence. All fees received from the soliciting party will be credited to Broker. In consideration of providing this service to Broker, Broker agrees to indemnify and hold harmless Alpine, its affiliates, officers, agents and employees from all claims, suits, investigations, damages and defense costs (including reasonable attorneys fees) that arise in connection with this paragraph.

9.6    COD Orders. Broker shall not introduce any retail or individual accounts requiring settlement on a "delivery versus payment" or "receive versus payment" basis without the prior written approval of Alpine. If such approval has been given, Broker shall arrange for timely settlement of all such transactions. Broker shall be responsible for complying with the requirements of NASD Rule 11860 with respect to those transactions, except that Alpine shall be responsible for delivering confirmations pursuant to NASD Rule 11860.

### 10.0    SAFEGUARDING OF FUNDS AND SECURITIES

Except as otherwise provided in this Agreement, Alpine shall be responsible for the safekeeping of all money and securities received by it pursuant to this Agreement. However, Alpine will not be responsible for any funds or securities delivered by a customer to Broker until such funds or securities are actually received by Alpine or deposited in bank accounts maintained by Alpine.

### 11.0    CONFIRMATIONS AND STATEMENTS

11.1    Preparation and Transmission of Confirmations and Statements. Alpine shall prepare confirmations and summary quarterly statements and shall, to the extent required, transmit them to customers and Broker in a timely fashion. Confirmations and statements shall be prepared on forms disclosing that the account is carried on a fully disclosed basis for the Broker in accordance with applicable rules, regulations and interpretations. Broker will have the ultimate regulatory responsibility for compliance with the prospectus delivery requirements of the Securities Act of 1933, as amended, regardless of its retention of a prospectus fulfillment service to perform delivery of same.

11.2    Examination and Notification of Errors. Broker shall examine promptly all confirmations, statements, and other reports provided to Broker by Alpine. Broker must promptly notify Alpine of any error claimed by Broker or Broker's customers in any account. If Broker fails to notify Alpine promptly of any error the existence of which was, or should reasonably have been, discoverable by review of confirmations, statements, and reports provided to Broker by Alpine, Broker shall be deemed to have waived its right to make any claim against Alpine with respect to such error.

### 12.0    ACCEPTANCE AND EXECUTION OF TRANSACTIONS

12.1    Responsibility to Accept or Reject Trades.  Alpine shall execute transactions in Broker's customers' accounts and release or deposit money or securities to or for accounts only upon Broker's instructions. Alpine reserves the right to accept written or oral transaction orders from Broker's customers in circumstances where it determines that the customers are unable to execute those transactions through Broker. Any instructions received directly from Broker's customers must be approved by a principal of Alpine. Notwithstanding any instructions to the contrary, Alpine may, after giving reasonable notice, (i) refuse to confirm a transaction or cancel a confirmation, (ii) reject a delivery or receipt of securities or money, (iii) refuse to clear a trade executed by Broker, or (iv) refuse to execute a trade for the account of the Broker or Broker's customer.

12.2    Responsibility for Errors in Execution. Broker shall be responsible for transmission to Alpine of all customer orders and for any errors in the Broker's recording or transmission of such orders. Alpine shall be responsible for any errors it might make in the further transmission and execution of such orders after their receipt, in proper and complete form, from Broker.

12.3    Settlement of Contracts and Transactions.  Unless otherwise agreed in writing, Alpine shall have no obligation to settle contracts and transactions in securities (i) between Broker and other broker dealers, (ii) between Broker and its customers, and (iii) between Broker and third persons.

### 13.0    OTHER OBLIGATIONS AND RESPONSIBILITIES OF BROKER

13.1    Other Clearing Agreements.  During the term of this Agreement, Broker may be allowed to enter into other similar agreements or obtain the services contemplated by this Agreement from other parties or supply the services contemplated by the Agreement with the prior written approval of Alpine.  Approval

shall not be unreasonably withheld. Agreements that were in place prior to this agreement will be deemed approved.

13.2   Disciplinary Action, Suspension or Restriction.  If Broker becomes subject to disciplinary action, suspension, or restriction by a federal or state agency, stock exchange, or regulatory or self regulatory organization having jurisdiction over Broker or Broker's securities business, Broker shall notify Alpine immediately, orally and in writing, and provide Alpine with a copy of any decision relating to such action, suspension, or restriction.  Broker shall reimburse Alpine for the fees and expenses associated with any legal advice Alpine may seek with respect to the effect of such action, suspension, or restriction on the rights and obligations of Alpine under this Agreement.  Alpine may take any action it reasonably deems to be necessary (i) to assure that it will continue to comply with all applicable legal, regulatory, and self-regulatory requirements, notwithstanding such action, suspension, or restriction, and (ii) to comply with any requests, directives, or demands made upon Alpine by any such federal or state agency, stock exchange, or regulatory or self-regulatory organization.

13.3   Provision of Financial Information.  Broker shall furnish Alpine with copies of FOCUS Reports, financial statements for the current fiscal year, the executed Forms X-17a-5 (Parts I and IIA) filed with the SEC, any amendments to Broker's Form BD, and any other regulatory or financial reports Alpine may from time to time require.  Broker shall provide such reports to Alpine at the time Broker files such reports with its primary examining authority. Broker shall also notify Alpine in advance of withdrawals of more than 10% of its net capital.

13.4   Fidelity Bond.  Broker shall maintain throughout the term of this Agreement fidelity insurance coverage in at least the minimum amount required under NASD rules. Alpine may require that Broker obtain additional fidelity insurance coverage if it reasonably determines that such coverage is necessary to assure Broker's performance of its obligations under this Agreement.

13.5   Execution Broker.  If Broker wishes to act as an "Executing Broker" as such term is understood in that certain letter dated January 25, 1994 from the Division of Market Regulation of the Securities and Exchange Commission, as the same may be amended, modified or supplemented from time to time (the "No-Action Letter") then all terms herein shall have the same meaning as ascribed thereto either in the Agreement or in the No-Action Letter as the sense thereof shall require. Broker may, from time to time, execute trades (either directly or through Alpine) for Prime Brokerage Accounts in compliance with the requirements of the No-Action Letter. (The No-Action Letter requires, Inter Alia, that a contract be executed between Alpine and Prime Broker, and between Broker and Prime Brokerage Customer prior to the transaction of any business hereunder). Broker shall promptly notify Alpine, but in no event later than 2:00 p.m. Salt Lake City, Utah time of trade date in a mutually acceptable fashion, of such trades in sufficient detail for Alpine to be able to report and transfer any trade executed by Broker on behalf of a Prime Brokerage Account to the relevant Prime Broker. Broker understands and agrees that if Prime Broker shall disaffirm or "dk" any trade executed by Broker on behalf of a Prime Brokerage Account; Broker shall open an account for such Prime Brokerage Account in its range of accounts and shall transfer or deliver the trade to such account at the risk and expense of Broker to the same extent as for any account introduced by Broker pursuant to the Agreement. Broker understands and agrees that all Prime Brokerage Accounts shall be conducted in accordance with the requirements of the No-Action Letter and any relevant agreement between Broker and a Prime Brokerage Customer, or between Alpine and relevant Prime Broker. Broker further agrees to supply Alpine with such documents, papers and things, which from time to time are reasonably required by Alpine to carry out the intention of this Paragraph. Broker agrees that it shall know its customer, obtain appropriate documentation, including new account form, and conduct its own credit check. Broker shall maintain facilities to clear any disaffirmed trades.

8

14.0 **OTHER OBLIGATIONS AND RESPONSIBILITIES OF ALPINE**

14.1 Use of Third Party Services. Alpine may, at its reasonable option, and consistent with common industry practice, retain one or more independent data processing or other service bureaus to perform functions (including, but not necessarily limited to pricing services or proxy mailing services) superfluous to those assigned to Alpine under this Agreement. If any such service bureau fails to perform an assigned function accurately, in accordance with specifications, or within the customary time periods, Alpine shall cause the service bureau to correct any error in its next regularly scheduled processing operation and to deliver any overdue work as soon as reasonably practicable. Except as stated in this subparagraph, Alpine shall not be responsible for any losses, damages, liability, or expenses claimed by Broker or its customers arising from any such failure beyond the amount of such losses, damages or expense which Alpine is able to recover pursuant to the terms of its agreement with such service bureau.

14.2 Backup Withholding. Broker hereby agrees to take necessary measures to comply with the backup withholding requirements of Section 3406 and the nonresident alien withholding requirements of Section 1441 of the Internal Revenue Code of 1986, as amended, with respect to its customer accounts. Broker agrees to furnish to Alpine in writing or by electronic transmission any tax information in its possession relating to each customer account transferred to Alpine and to each future customer (including the customer's taxpayer identification number and any certifications provided by the customer on IRS Forms W-9, W-8, or 1001 or any authorized substitute) and agrees that Alpine may rely on such information. Alpine agrees to notify Broker of any account not in compliance with such back-up withholding requirements. Broker hereby authorizes Alpine to employ any procedures permitted under applicable law or regulation to achieve compliance with withholding obligations under the federal income tax law, including procedures pertaining to backup withholding on orders to purchase or sell securities which are received from customers by telephone or electronic transmission.

15.0 **SERVICES FOR WHICH ALPINE IS NOT RESPONSIBLE**

Unless otherwise expressly agreed in writing, Alpine shall not provide nor be responsible for providing any of the following services:

15.1 Accounting, Etc. Accounting, bookkeeping, record-keeping, cashiering, or other services involving commodity transactions, or any other transactions not involving securities; or any matter not contemplated by the Agreement.

15.2 Payroll, Financial Statements, Etc. Preparation of Broker's payroll records, financial statements, or any analysis thereof;

15.3 Checks. Preparation or issuance of checks in payment of Broker's expenses, other than expenses incurred by Alpine on behalf of Broker pursuant to this Agreement;

15.4 Payment of Commissions. Payment of commissions to Broker's sales personnel.

16.0 **LIABILITY OF ALPINE**

16.1 Alpine Indemnification. In addition to any other obligations it may possess under other provisions of this Agreement, Alpine shall indemnify, defend, and hold harmless Broker from and against all claims, demands, proceedings, suits, actions, liabilities, expenses, attorney's fees, and costs in connection therewith arising out of any reckless, dishonest, fraudulent, or criminal acts or omissions on the part of any of its officers or employees with respect to the services provided by Alpine under this Agreement. Notwithstanding the foregoing, Alpine shall have no liability to any of Broker's customers

9

for any loss suffered by any customer. Alpine's liability will be only to Broker and then only to the extent expressly set forth in this Agreement.

16.2   Defense of Third Party Claims.   If, within 10 days after receiving written notice of any claim, demand, suit, proceeding, or action with respect to which Broker may have any colorable claims to indemnification under this Agreement, Alpine shall fail to institute the defense of Alpine in connection with such claim, demand, suit, proceeding, or action, or if thereafter Alpine shall fail diligently to pursue such defense, Broker shall have the right to defend such action or settle such action. The reasonable costs and expenses, including attorney's fees, associated with such a defense or settlement shall be borne by Alpine. The exercise of the right to participate in or assume the responsibility for any such defense shall not limit in any way Broker's right to indemnification under this Paragraph.

16.3   Damages.   Alpine shall not be liable for special, indirect, incidental, consequential or punitive damages which Broker, a customer of Broker, or any other third party may incur or experience, whether such damages are incurred or experienced as a result of entering into or relying on this Agreement or otherwise, even if Alpine has been advised of the possibility of such damages. Broker and Alpine each agree not to assist any claim for punitive damages against the other.

16.4   Alpine's Right to Compete.   Nothing in this Agreement shall be deemed to restrict in any way the right of Alpine or any affiliate of Alpine to compete with Broker in any or all aspects of Broker's business.

16.5   Broker's customer accounts.   Alpine shall not use any information obtained from Broker's customers' accounts to entice, solicit or otherwise induce Broker's customers to become Alpine's customers.

## 17.0   LIABILITY OF BROKER

17.1   Broker Indemnification.   In addition to any other obligations it may possess under other provisions of this Agreement, except any act or failure to act which is the result of gross negligence or willful misconduct on the part of any such Alpine indemnified person Broker shall indemnify, defend, and hold harmless Alpine, any controlling person of Alpine, any principal of Alpine, and any shareholder of Alpine, from and against all claims, demands, proceedings, suits, and actions and all liabilities, expenses, attorney's fees (including fees and costs incurred in enforcing it's right to indemnification), and costs in connection therewith arising out of one or more of Broker's or any of its employee's negligent, dishonest, fraudulent or criminal acts or omissions.

17.1.1   Failure to Make a Payment or Deliver Securities.   The failure of Broker or a Broker's customer to make any payment or deliver any securities when due shall be cured by Broker in accordance with Regulation T and/or Regulation SHO, and/or other applicable rules or regulations. A check received by Alpine from a customer shall be credited to customer's account; nevertheless, Broker shall be liable until such check has cleared through the banking system and the proceeds are actually received and credited to Alpine (without any subsequent chargeback) by its bank.

17.1.2   Broker's Failure to Perform.   Failure of Broker to perform any duty, obligation, or responsibility with respect to customer accounts as set forth in this Agreement. Broker's indemnification obligation under this subparagraph shall not be affected by the participation of Alpine or any person controlling it or controlled by it within the meaning of the Securities Exchange Act of 1934, as amended, in any transaction giving rise to such an obligation, unless such participation constitutes recklessness, fraud, or criminal conduct.

17.1.3 <u>Improper Conduct by Agents</u>. Broker assumes any liabilities incurred as a result of any negligent, dishonest, fraudulent, or criminal act or omission on the part of any of Broker's officers, directors, employees or agents.

17.1.4 <u>Failure of a Customer to Perform Obligations</u>. Any failure by any of Broker's customers to perform any commitment or obligation with respect to a transaction carried by Alpine under this Agreement, whether or not such failure was under the control of Broker, shall be the Broker's responsibility.

17.1.5 <u>Customer Claims and Disputes</u>. Any claim or dispute between Broker and a customer with respect to services provided under this Agreement, including but not limited to any claim or dispute concerning the validity of a customer order in the form the order was transmitted to Alpine by Broker and any claim arising in connection with Alpine's guarantee of any signature of any customer of Broker.

17.1.6 <u>Warranties</u>. Any adverse claim with respect to any security delivered or cleared by Alpine, including a claim of a defect in title with respect to securities that are alleged to have been forged, counterfeited, raised or otherwise altered, or if they are alleged to have been lost or stolen. The parties agree that Alpine shall be deemed to be an intermediary between Broker and customer and shall be deemed to make no warranties other than as provided in Section 8-306(3) of the Uniform Commercial Code.

17.1.7 <u>Default of Third Party Broker</u>. Any default by a third party broker with whom the Broker deals on a principal or agency basis in a transaction either not executed by Alpine or not cleared by Alpine even if permitted by Alpine as provided herein.

17.1.8 <u>Prior Self-Clearing Arrangements</u>. Any guarantee, indemnification, or hold harmless agreement in connection with Broker's business or customers that Alpine may provide to the National Securities Clearing Corporation, the Depository Trust Company, or any other clearing, depository, or self regulatory organization with respect to transactions self-cleared by Broker prior to transfer of such functions to Alpine.

17.1.9 <u>Breach of Warranty by Broker</u>. Any breach by Broker of any representation or warranty made by it under this Agreement.

17.1.10 <u>Deposit of Checks to Customer's Accounts</u>. Any failure to exercise due diligence in reviewing checks received from Broker's customers to insure that same are in proper form, or in the issuance of instructions to Alpine regarding the accounts into which checks are to be deposited.

17.1.11 <u>Assets Not Held in Brokerage Account</u>. Any claim asserted against Alpine alleging the inaccuracy of any information appearing on Broker's customer brokerage account statements with respect to assets not held in the brokerage account, regardless of whether such information was provided by Broker, customer or a third-party.

17.2 <u>Defense of Third Party Claims</u>. If, within 10 days after receiving written notice of any claim, demand, suit, proceeding, or action with respect to which Alpine may have any colorable claim to indemnification under this Agreement, Broker shall fail to institute the defense of Alpine in connection with such claim, demand, suit, proceeding, or action, or if thereafter Broker shall fail diligently to pursue such defense, Alpine shall have the right to defend such action or settle such action. The costs and expenses, including attorney's fees, associated with such a defense or settlement shall be borne by Broker. The exercise of the right to participate in or assume the responsibility for any such defense shall not limit in any way Alpine's rights to indemnification under this Paragraph. If Alpine has to cover expenses or

11

retain counsel of its own, all such proper expenses related thereto, including legal fees, not paid within thirty (30) days after an invoice is rendered therefore to Broker shall bear interest at t rate equal to eighteen percent (18%) per annum until paid by Broker.

## 18.0 FEES AND SETTLEMENTS FOR SECURITIES TRANSACTIONS

18.1 <u>Commissions</u>. Alpine shall charge each of Broker's customers the commission, markup and any other charge or expense that Broker instructs it to charge for each transaction, subject to the "5% guideline". If instructions are not received with respect to a transaction in the time period required by Alpine to implement those instructions, Alpine shall charge the customer the commission, markup, or other charge or expense prescribed in the basic commission schedule delivered to Alpine by Broker. This basic schedule may be amended from time to time by Broker by written instructions delivered to Alpine. Alpine, shall only be required to implement such amendments to the basic schedule to the extent such amendments are within the usual capabilities of Alpine's data processing and operations systems and only within such reasonable time limitations as Alpine may deem necessary to avoid disruption of its normal operating capabilities.

18.2 <u>Responsibility for Pricing</u>. Broker shall establish the commissions, mark-ups and other charges or expenses to be charged to customers in accordance with all applicable laws, rules, and regulations of the SEC, NASD, NYSE, and other regulatory and self-regulatory agencies and organizations. Alpine shall exercise no control or influence over the establishment of such commissions, mark-ups or other charges or expenses. This provision shall not affect Alpine's right to charge Broker or Broker's customers reasonable fees for the services provided under this Agreement, including SEC transaction fees, fees for inactive accounts, fees to transfer a Broker's customer account to another Broker/Dealer and other appropriate fees. Broker may instruct Alpine to charge such fees to its customers but remains liable for the payment thereof. Broker shall notify its customers of fees charged to them.

18.3 <u>Settlement</u>. Commissions charged Broker's customers shall be collected by Alpine and credited to Broker, after deducting Alpine's compensation referred to in Subparagraph 18.4 below and any other amount owed to Alpine pursuant to this Agreement. Such commissions shall be remitted to Broker on a monthly basis, approximately ten days after the final settlement date of each month. More frequent remittances may be advanced to Broker if the parties so agree and if the estimated current activity in the accounts and prior experience justify such advances.

18.4 <u>Fees for Clearing Services</u>. As compensation for services provided pursuant to this Agreement, Alpine shall deduct from the commissions, mark-up, mark-down or fees charged Broker's customers a fee of Twenty Dollars ($20.00) for each transaction cleared by Alpine on behalf of Broker. (See Schedule A). The compensation pursuant to this paragraph may be changed by Alpine at any time on thirty days prior written notice to Broker or from time to time as may be agreed by both parties. Broker shall promptly notify Alpine of any change in the nature or mix of the business engaged in by Broker. The minimum monthly fee to Alpine shall be two-thousand dollars ($2000.00).

## 19.0 DEPOSIT ACCOUNT

19.1 <u>Establishment of Deposit Account</u>. To further assure Broker's performance of its obligations under this Agreement, including but not limited to its indemnification obligations under Paragraph 17, Broker shall, on or before the execution of this Agreement, establish an account at Alpine to be designated as the Broker's Deposit Account (the "Deposit Account"). The Deposit Account shall at all times contain cash, securities, or a combination of both, having a market value of at least the amount set forth in Schedule A. The securities placed in the Deposit Account shall consist only of direct obligations issued by or guaranteed as to principal and interest by the United States Government. In the event of a

12

substantial change in the nature and extent of Broker's business operations, Alpine may require immediately that an additional amount be deposited in the Deposit Account. If such a deposit is not made in the amount specified whether or not Broker agrees that the amount is justified under this subparagraph, Alpine shall have the right to terminate this Agreement forthwith.

19.2     Ownership Interest.  The Scottsdale Capital Advisor cash deposit does not represent ownership interest in the clearing broker, Alpine Securities.

19.3     Alpine's Right to Offset Commissions and Deposit Account.  For any claim Alpine may have against Broker or any customer of Broker, Broker grants Alpine a continuing security interest and general lien upon the Deposit Account and all other accounts of Broker held at Alpine, and acknowledges Alpine shall have a right of setoff against such Deposit Account and other accounts at Alpine to the extent of any account debit, claim or liability including any attorneys' fees incurred by Alpine related thereto or to the indemnification provisions of Section 17 hereof. In connection therewith, Broker further grants Alpine a security interest and right of setoff against all the moneys, securities and other property belonging to Broker in the possession or control of Alpine or a financial intermediary for the account of Broker and authorizes Alpine to perfect such security interest by giving notice thereof to such financial intermediary. If (i) Alpine shall have any claim against Broker or a customer of Broker which has not been resolved within five business days after Alpine presents such claim to Broker, or (ii) if Alpine shall suffer any loss or incur any expense for which it is entitled to be indemnified pursuant to this Agreement, and Broker shall fail to make such indemnification within five business days after being requested to do so, Alpine may deduct the amount of such claim, loss, or expense from the commissions to be credited to Broker on the next monthly or other periodic settlement date pursuant to Paragraph 18.3. If the amount of these commissions is less than the amount of such claim, loss, or expense, Alpine may withdraw from the Deposit Account cash or securities (or both) having a market value equal to the amount of such deficiency. Broker shall be obligated to make an immediate deposit in the Deposit Account of cash or securities sufficient to bring the Account back to a value of at least the amount required by Schedule A. Alpine shall further have the right to satisfy the claim, liability or deficiency by liquidating any securities or other property and withdrawing the amount, in any order from the following: (i) the relevant account; (ii) the Deposit Account; and (iii) any other account with Alpine or with such other organizations as Alpine has been granted a security interest in.  Alpine shall notify Broker of any such liquidations and withdrawals.

19.4     Termination of Deposit Account.  Upon the termination of this Agreement, or as soon there after as practical,  (within 30 calendar days), Alpine shall pay and deliver to Broker the funds and securities in the Deposit Account, less any amounts which it is entitled under the preceding paragraph; provided, however, that Alpine may retain in the Deposit Account such amount for such period as it deems appropriate for its protection from any claim or proceeding of any type, then pending or threatened, until the final determination of such claim or proceeding is made. If a threatened claim or proceeding is not resolved or if a legal action or proceeding is not concluded, any amount retained with respect to such claim, proceeding, or action shall be instituted within a reasonable time after the termination paid or delivered to Broker.

19.5     Issuance of Protective Decree.  In the event that Scottsdale Capital Advisors, (the introducing Broker-Dealer), is the subject of the issuance of a protective decree pursuant to the Securities Investor Protection Act of 1970 (15 USC 78aaa-lll), Alpine Securities claim for payment of a termination fee under this agreement shall be subordinate to claims of Scottsdale Capital Advisor's customers that have been approved by the Trustee appointed by the Securities Investor Protection Corporation pursuant to the issuance of such protective decree.

## 20.0   PROPRIETARY ACCOUNTS OF INTRODUCING BROKERS AND DEALERS (PAIB)

Alpine agrees to establish a separate reserve account for proprietary assets held by Broker so that Broker can treat these assets as allowable assets under SEC Rule I Sc3-1. Alpine agrees to perform the required computation on behalf of Broker in accordance with the following provisions, procedures and interpretations set forth in the SEC's No-Action Letter regarding Proprietary Accounts of Introducing Brokers and Dealers (PAIB) dated November 3, 1998:

Broker has agreed to not have proprietary trading accounts cleared by Alpine.

20.1   PAIB Computation.  Alpine will perform a separate computation for PAIB assets (PAIB reserve computation) of Broker in accordance with the customer reserve computation set forth in SEC Rule 15c3-3 (customer reserve formula) with the following modifications:

   (a)  Any credit (including a credit applied to reduce a debit) that is included in the customer reserve formula will not be included as a credit in the PAIB reserve computation;
   (b)  Note E(3) to Rule 15c3-3a which reduces debit balances by one percent under the basic method and subparagraph (a)(I)(ii)(A) of Rule 15c3-1 which reduces debit balances by three percent under the alternative method will not apply; and
   (c)  Neither Note E(I) to Rule 15c3-3a nor NYSE Interpretation /04 to Item 10 of Rule 15c3-3a regarding securities concentration charges is applicable to the PAIB reserve computation.

20.2   PAIB Assets Separate.  PAIB reserve computation will include all the proprietary accounts of Broker. All PAIB assets will be kept separate and distinct from customer assets under the customer reserve computation set forth in SEC Rule 15c3-3.

20.3   PAIB Computation Time Frame.  PAIB reserve computation will be prepared within the same time frames as those prescribed by Rule 15c3-3 for the customer reserve formula.

20.4   Special Reserve Account.  Alpine will establish and maintain a separate "Special Reserve Account for the Exclusive Benefit of PAIB Customers" with a bank in conformity with the standards of Rule 15c3-3(f) (PAIB Reserve Account). Cash and/or qualified securities as defined in the Rule will be maintained in the PAIB Reserve Account in an amount equal to the PAIB reserve requirement.

20.5   Deposit Requirement.  If the PAIB reserve computation results in a deposit requirement, the requirement can be satisfied to the extent of any excess debit in the customer reserve formula of the same date. However, a deposit requirement resulting from the customer reserve formula cannot be satisfied with excess debits from the PAIB reserve computation.

20.6   Notification.  Within two business days of entering into this agreement, Broker must notify its designated examining authority (DEA) in writing that it has entered into a PAIB agreement with its clearing broker-dealer.

20.7   Insufficient Deposits.  Upon discovery that any deposit made to the PAIB Reserve Account did not satisfy its deposit requirement, Alpine will immediately notify its DEA and the SEC. Unless a corrective plan is found to be acceptable by the SEC and the DEA, Alpine will provide written notification within five business days of the date of discovery to Broker that PAIB assets held by Alpine will not be deemed allowable assets for net capital purposes.

14

## 21.0   COMMUNICATION WITH CUSTOMERS

21.1   <u>Notice to Customers</u>.  Alpine shall, upon the opening of an account pursuant to paragraph 5 of this Agreement, mail to each customer a copy of the Notice to Customers required by NASD Rule 3230(g).

21.2   <u>Customer Inquiries and Complaints</u>.  Broker and Alpine each agree to forward to the other any written complaint received from a customer regarding a function the other has agreed to perform pursuant to this Agreement.

21.3   <u>Restriction on Advertising</u>.  Neither Alpine nor Broker shall utilize the name of the other in any way without the other's prior written consent nor shall either party employ the other's name in such a manner as to create the impression that the relationship between them is anything other than that of clearing broker and introducing broker. Broker shall not hold itself out as an agent of Alpine or as a subsidiary or company controlled directly or indirectly by or affiliated with Alpine.

## 22.0   TERMINATION OF AGREEMENT

This Agreement shall continue until terminated as hereinafter provided:

22.1   <u>Termination Upon 60-Day Notice</u>.  This Agreement may be terminated by either party without cause upon sixty days prior written notice delivered in person or by registered or certified mail. If either party terminates the Agreement pursuant to this subparagraph, Alpine shall have the right to impose reasonable limitations upon Broker's activities during the period between the giving of notice and the transfer of Broker's accounts.

22.2   <u>Change in Compensation Schedule</u>.  If, pursuant to paragraph 18.4 of this Agreement, Alpine shall make any unilateral change in the compensation schedule described in that subparagraph, and that change causes the increase in Alpine's compensation to exceed 20 percent during any calendar year, Broker may, upon 60 days prior written notice to Alpine, terminate this Agreement on the effective date of such unilateral change.

22.3   <u>Default</u>.  If either party defaults in the performance of its obligations under this Agreement, or otherwise violates the provisions of this Agreement, the nondefaulting party may terminate this Agreement by delivering written notice to the defaulting party (i) specifying the nature of the default and (ii) notifying the defaulting party that unless the default is cured within a period of ten days from receipt of the notice, this Agreement will be terminated without further proceedings by the nondefaulting party.

22.4   <u>Disability</u>.  This Agreement may be terminated by Alpine or Broker immediately in the event that the other party is enjoined, disabled, suspended, prohibited, or otherwise becomes unable to engage in the securities business or any part of it by operation of law or as a result of any administrative or judicial proceeding or action by the SEC, any state securities law administrator, or any regulatory or self-regulatory organization having jurisdiction over such party.

22.5   <u>Conversion of Accounts</u>.  In the event that this Agreement is terminated for any reason, Broker shall arrange for the conversion of Broker's and its customer accounts to another clearing broker or to Broker if it becomes self-clearing. Broker shall give Alpine notice (the "Conversion Notice") of (i) the name of the broker that will assume responsibility for clearing services for Broker and Broker's customers, (ii) the date on which such broker will commence providing such services, (iii) Broker's undertaking, in form and substance satisfactory to Alpine, that Broker's agreement with such broker provides that such broker will accept on conversion all Broker and its customers accounts then maintained

by Alpine, and (iv) the name of an individual or individuals within the new clearing broker's organization whom Alpine may contact to coordinate the conversion. The Conversion Notice shall accompany Broker's notice of termination given pursuant to this paragraph. If Broker fails to give Conversion Notice to Alpine, Alpine may give to Broker's customers such notice as Alpine deems appropriate of the termination of this Agreement and may make such arrangements as Alpine deems appropriate for transfer or delivery Broker and its customer accounts. The expense of providing such notice and making such arrangements shall be charged to Broker.

22.6     Survival. Termination of this Agreement in any manner shall not release Broker or Alpine from any liability or responsibility to the other with respect to transactions effected prior to the effective date of such termination, whether or not claims relating to such transactions shall have been made before or after such termination.

## 23.0   CONFIDENTIAL NATURE OF DOCUMENTS AND OTHER INFORMATION

Neither Alpine nor Broker shall disclose the terms of this Agreement or information obtained as a result thereof to any outside party except to regulatory or self-regulatory organizations with appropriate jurisdiction, pursuant to judicial process or to authorized employees of the other on a need-to-know basis. Any other publication or disclosure of the terms of this Agreement may be made only with the prior written consent of the other party. Broker and Alpine shall each maintain the confidentiality of documents and information received from the other party pursuant to this Agreement. Alpine and Broker each agree that any information regarding the identity of the other's customers shall be kept confidential and not used by the other except as required in connection with obligations under this agreement.

Broker acknowledges that the services Alpine provides hereunder involve Broker access to proprietary technology, trading and other systems, and that techniques, algorithms and processes contained in such systems constitute trade secrets and shall be safeguarded by Broker, and the Broker shall exercise reasonable care to protect Alpine's interest in such trade secrets. Broker agrees to make the proprietary nature of such systems known to those of its consultants, staff, agents or clients who may reasonably be expected to come into contact with such systems. Broker agrees that any breach of this confidentiality provision may result in its being liable for damages as provided by law.

## 24.0   ACTION AGAINST CUSTOMERS BY ALPINE

Alpine may, in its sole discretion and at its own expense, upon written notice to Broker institute and prosecute in its name any action or proceeding against any of Broker's customers in relation to any controversy or claim arising out of Alpine's transactions with Broker or with Broker's customers. Nothing contained in this Agreement shall be deemed either (a) to require Alpine to institute or prosecute such an action or proceeding; or (b) to impair or prejudice its right to do so, should it so elect, nor shall the institution or prosecution of any such action or proceeding relieve Broker of any liability or responsibility which Broker would otherwise have had under this Agreement. Broker shall assign to Alpine its rights against its customers to the extent requested by Alpine and necessary to effectuate the provisions of this Paragraph.

## 25.0   NOTICES

Any notice or request required or permitted to be given under this Agreement shall be sufficient if it is in writing and sent by hand or by certified mail, return receipt requested, to the parties at the following address:

Broker:   Scottsdale Capital Advisors, Inc.
7170 E McDonald Drive, Suite 6
Scottsdale, AZ 85253

Attn:   John Hurry / Justine Hurry

Alpine:   Alpine Securities Corporation
440 East 400 South
Salt Lake City, Utah 84111
Attn: Todd Groskreutz

## 26.0   ARBITRATION

26.1   <u>Arbitration Requirement</u>.  Any dispute between Broker and Alpine that cannot be settled shall be taken to arbitration as set forth in paragraph 26.3 below.

26.2   <u>Arbitration Disclosure</u>.

- ARBITRATION IS FINAL AND BINDING ON THE PARTIES.

- THE PARTIES ARE WAIVING THEIR RIGHT TO SEEK REMEDIES IN COURT, INCLUDING THE RIGHT TO JURY TRIAL.

- PRE-ARBITRATION DISCOVERY IS GENERALLY MORE LIMITED THAN AND DIFFERENT FROM COURT PROCEEDINGS.

- THE ARBITRATORS' AWARD IS NOT REQUIRED TO INCLUDE FACTUAL FINDINGS OR LEGAL REASONING AND ANY PARTY'S RIGHT TO APPEAL OR TO SEEK MODIFICATION OF RULINGS BY THE ARBITRATORS IS STRICTLY LIMITED.

- THE PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES INDUSTRY.

26.3   <u>Arbitration Agreement</u>.

ANY CONTROVERSY BETWEEN ALPINE AND BROKER ARISING OUT OF BROKER'S BUSINESS OR THIS AGREEMENT SHALL BE SUBMITTED TO ARBITRATION CONDUCTED BEFORE THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC., AND IN ACCORDANCE WITH THE RULES PERTAINING THERETO AND SHALL BE CONDUCTED AS A BROKER TO BROKER OR MEMBER VS MEMBER DISPUTE. ARBITRATION MUST BE COMMENCED BY SERVICE UPON THE OTHER PARTY OF A WRITTEN DEMAND FOR

ARBITRATION OR A WRITTEN NOTICE OF INTENTION TO ARBITRATE, THEREIN ELECTING THE ARBITRATION TRIBUNAL.

NO PERSON SHALL BRING A PUTATIVE OR CERTIFIED CLASS ACTION TO ARBITRATION, NOR SEEK TO ENFORCE ANY PRE-DISPUTE ARBITRATION AGREEMENT AGAINST ANY PERSON WHO HAS INITIATED IN COURT A PUTATIVE CLASS ACTION AND WHO IS A MEMBER OF A PUTATIVE CLASS AND WHO HAS NOT OPTED OUT OF THE CLASS WITH RESPECT TO ANY CLAIMS ENCOMPASSED BY THE PUTATIVE CLASS ACTION UNTIL: (i) THE CLASS CERTIFICATION IS DENIED; (ii) THE CLASS IS DECERTIFIED; OR (iii) THE CUSTOMER IS EXCLUDED FROM THE CLASS BY THE COURT. SUCH FORBEARANCE TO ENFORCE AN AGREEMENT TO ARBITRATE SHALL NOT CONSTITUTE A WAIVER OF ANY RIGHTS UNDER THIS AGREEMENT EXCEPT TO THE EXTENT STATED HEREIN.

## 27.0   GENERAL PROVISIONS

27.1     Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the respective permitted successors and assigns of Broker and Alpine. No assignment of this Agreement by Broker shall be effective unless Alpine's written consent shall be first obtained.

27.2     Severability. If any provision or condition of this Agreement shall be held to be invalid or unenforceable, the validity or enforceability of the remaining provisions and conditions shall not be affected hereby.

27.3     Counterparts. This Agreement may be executed in one or more counterparts, all of which taken together shall constitute a single agreement.

27.4     Entire Agreement / Amendments. This Agreement represents the entire agreement between the parties with respect to the subject matter contained herein. This Agreement may not be changed orally, but only by an agreement in writing signed by the parties.

27.5     Captions and Headings. Captions and headings herein are for convenience only and are not of substantive effect.

27.6     Applicable Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Utah, without giving effect to the conflicts of laws principles thereof.

27.7     Citations. Any references to the rules or regulations of the SEC, the NASD or any other regulatory or self-regulatory organization are current citations. Any changes in the citations (whether or not there are any changes in the text of such rules or regulations) shall be automatically incorporated herein.

27.8     Construction of Agreement. Neither this Agreement nor the performance of the services hereunder shall be considered to create a joint venture or partnership between Alpine and Broker or between Broker and other brokers for whom Alpine may perform the same or similar service.

27.9     No Third Party Beneficiaries. This Agreement is between the parties hereto and is not intended to confer any benefits on third parties, including, but not limited to, customers of Broker.

27.10    Non-Exclusivity of Remedies. The enumeration herein of specific remedies shall not be exclusive of any other remedies. Any delay or failure by a party to this Agreement to exercise any right, power, remedy or privilege herein contained, or now or hereafter existing under any applicable statute or law,

shall not be construed to be a waiver of such right, power, remedy, or privilege.  No single, partial, or other exercise of any such right power, remedy, or privilege shall preclude the further exercise thereof or the exercise of any other right, power, remedy, or privilege.

27.11   SEC Release 34-31511 Provision.  Pursuant to the interpretation of Introducing Accounts on a Fully Disclosed Basis contained in SEC Release 34-41511, it is hereby agreed between Broker and Alpine that, insofar as the "financial responsibility rules" of the SEC and Securities Investor Protection Act are concerned, the accounts Broker introduces to Alpine on a fully disclosed basis shall be considered to be accounts of Alpine and not Broker's accounts. Nothing in this paragraph will otherwise change or affect the provisions of this Agreement which provide that the customer account remains Broker's customer account for all other purposes, including but not limited to, supervision, suitability and indemnification.

IN WITNESS WHEREOF the parties have hereto affixed their hands and seals by their duly authorized officers as of the date first above written.

This Agreement contains a pre-dispute arbitration clause in paragraph 26 on page 20. Broker acknowledges receiving a copy of this Agreement.

BROKER:

Scottsdale Capital Advisors, Inc.

By: _____

Name: _____

Title: _____

ALPINE:

Alpine Securities Corporation

By: _____
Name:   Todd Groskreutz
Title:   Chief Financial Officer

**Schedule A to Fully Disclosed Clearing Agreement**
**Between Alpine Securities Corporation and Scottsdale Capital Advisors, Inc.**

Transfer charges, Wire Fees, Account Transfer charges, DWAC and DO charges, and all other charges generated by Scottsdale Capital Advisors, ("SCOTTSDALE") customers shall be charged directly to such customer or to SCOTTSDALE at brokers election. (Certificate deposits are billed to the customer at $75.00 per physical certificate deposit, per CUSIP per deposit).

SCOTTSDALE will route orders for which Alpine is acting as clearing agent, through Alpines on-line order management system, (Go-Trader). Alpine will use this system to restrict SCOTTSDALE from selling stock that is not long in the account and from buying securities for which there are not sufficient funds to cover the purchase.

Any sales of securities deemed to be illiquid by NSCC must be executed x-clearing. Illiquid securities are defined as sales of at least 100,000 shares AND position must be at least 25% of the average daily volume, (ADV). Purchases are subject to the same execution requirements if at least 10,000,000 shares are purchased within trade date and settlement date, (T + 3).

The Deposit Account shall have a minimum cash balance of $25,000. Additional funds may be required based on activity. Any special charges due to NSCC generated by broker will also be required to be included in the deposit account.

No long or short positions may be carried by broker for its proprietary trading account.

Fees for clearing services shall be as follows:     $20.00 per order, per day. $2000.00 per month minimum

Go-Trader terminal fees:                  $75.00/terminal per month
Aspire Posse terminal fees:               $25.00/terminal per month
Citrix license:                           $300 install per user, $150 per year per user

Blue Sheet charge:                        $75.00 per request

01/28/2010 15:12 9543512685 PAGE 08/25
JAN-28-2010 12:55 From:2423278875 To:19543512605 Page:3/20

"This amount may be applied without a copy of a valid photo a identification"

## ALPINE SECURITIES
Stock Brokerage & Investment Company

Account Type  3488 6730

| Corporate | Partnership | Sole Proprietor | Limited-Liability Company |

**Information about the business:**

Official Name and Entity

GIBRALTAR GLOBAL SECURITIES INC   N/A

214 LAKOOKJ CRT SANDYPORT NASSAU BAHAMAS

P.O. BOX SP63286O NASSAU BAHAMAS

**Information Release**
In order to remain with SEC regulations, we require your permission to release your account information to insure we will continue your last break.

☑ I am doing my permission

**Banking**
Bank Name  ROYAL BANK OF CANADA  NASSAU, BAHAMAS

**Information About Authorized Persons**

**Primary Authorized Person**
Name

WARREN A DAVIS

Title  MANAGING DIRECTOR

Email Address  WDAVIS@GIGSIBAHAMAS.COM

Phone  (242) 327-4474

Are you employed by a registered broker-dealer, a securities exchange, or FINRA?
NASSAU BAHAMAS
Location (City, State)  SANDIEGO   GIBRALTAR GLOBAL SECURITIES

**Co-Authorized Person (if Applicable)**
Name

In the space below, please provide a complete list of the public companies in which the corporation or any authorized individual is:
(1) An officer or director;
(2) A holder, directly or indirectly, of 5% or more equity interest.
(3) A corporate "insider," "controlling person," member of a controlling group or a person, giving of a corporate insider, controlling person or group.
Use the back of this form if you need additional space. If none, write "none."  NONE

**Distribution**
I would like the proceeds of sale of:
☐ Sent in the form of a check.   ☑ Held in a Dreyfus money market fund.   ☐ Sent as a wire transfer (paid institutions).

CASEY PETERSON

## Suitability Determination

Alpine Securities will use the following information to determine your suitability as per the 15-g rules set forth
by The United States Securities and Exchange Commission.

### Financial Information

Annual Income:
- ☐ $0 - $25,000
- ☐ $25,000 - $50,000
- ☐ $50,000 - $100,000
- ☐ $100,000 - $200,000
- ☑ Over $200,000

Net Worth
- ☐ $0 - $25,000
- ☐ $25,000 - $100,000
- ☐ $100,000 - $500,000
- ☐ $500,000 - $1,000,000
- ☑ $Over 1,000,000

Liquid Net Worth
- ☐ $0 - $25,000
- ☐ $25,000 - $100,000
- ☐ $100,000 - $500,000
- ☑ $500,000 - $1,000,000
- ☐ Over $1,000,000

### Personal Assets:
- _80_% Stock
- ___% Bonds
- _20_% Cash
- ___% Real Estate
- ___% Business
- ___% Other

### Tax Bracket
Please check:
- ☐ 15%
- ☐ 20%  N/A-
- ☐ 25%
- ☐ 28%
- ☐ 33%
- ☐ 35%+

### Investment Objectives
- ☑ Speculation
- ☑ Growth
- ☐ Income
- ☐ Tax Advantage
- ☐ Safety of Principle
- ☐ Other:

### Experience
Please fill in amount (in years) of experience
with each:
- _5_ Stocks
- _15_ Bonds
- _5_ Options
- _7_ Commodities

### Education:
Please fill in number of years attended:
- _65_ High School
- _4_ College (Undergraduate)
- ___ College (Graduate)

Have you attended any business
classes or investor training?
☑ Yes   ☐ No

If Yes, please list institutions where classes were
attended in the space below:

WINDSOR UNIVERSITY
WINDSOR ONT.
CANADA

### PLEASE READ BEFORE SIGNING

Certification:

Under penalties of perjury, I certify that I have previously received a Risk Disclosure Document containing important information about designated securities. Furthermore, the undersigned hereby represents that he/she has read the terms and conditions of the Cash Account Agreement, including the reverse side thereof, and agrees to be bound, jointly and severally, to all the terms and conditions. The undersigned further affirms he/she is not acting as a nominee. The undersigned agree(s) to notify Alpine Securities if any of the above information changes.

_____                                    _1/28/10_
Customer Signature                                              Date

_____                                    _____
Joint Customer Signature (if Applicable)                        Date

I hereby certify that all information has been provided to me by the customer:

_____                                    _2-2-10_
Registered Representative                                       Date

_____                                    _2-10-10_
Approval of Principal                                           Date

# Exhibit B

## Alpine Securities Corporation Customer Agreement

In consideration of your opening one or more accounts for me ("we", "us" and "our" are each substituted for "I", "me" and "my', respectively, in the case of multiple account holders, corporations and other entities), and your agreeing to act as broker/dealer for me for the purchase or sale of securities, it is agreed in respect to any and a l accounts, which I now have or may at any future time have with Alpine Securities Corporation or its direct or indirect subsidiaries and affiliates or their successors or assigns (hereinafter referred to as "you", 'your" or "Alpine"), that:

1.  I am of legal age and authorized to enter into this Agreement on my behalf.  Unless otherwise disclosed to you in writing, I am not an employee of any member firm of the National Association of Security Dealers, Inc. (NASD) or any exchange.

2.  I hereby appoint Alpine as my agent for the purpose of carrying my direction for the purchase or sale of securities and warrant that any securities which I may order Alpine to sell will be fully and freely marketable and free from any infirmity of any kind, unless I should advise to the contrary in writing, before or at the time any order is placed.  You may charge my account(s) with such usual and customary charges as you may determine to cover your services and facilities, including, but not limited to, custody, transaction and termination fees.

3.  I warrant and agree that all transactions that I direct Alpine to execute on my behalf shall be settled within three (3) business days following the sale or purchase and that I shall pay Alpine one and one half percent (1.5%) monthly interest on all accounts not settled within that time period.  If I fail to deliver the necessary funds for the securities purchased for my account or delivery of the securities sold for my account, appropriately endorsed and in proper negotiable form, within three (3) business days following the purchase or sale, Alpine shall have the right, without demand upon or notice (such demand and notice being expressly waived) to close my account, and close out any open trade or transaction in such account or any exchange or market, at public or private sale, or by public or private purchase without advertising such sale or purchase (such advertising being hereby expressly waived), and such sale or purchase may be made in one or a series of sales or purchases as Alpine may elect.

4.  I expressly authorize Alpine to accept from me oral, telephonic, email or other electronic orders for the purchase or sale of securities and in consideration of Alpine's acceptance of this agreement, I hereby waive any defense that I may have because any such order was not in writing or evidenced by a memorandum in writing as required by any statute.

5.  Until payment has been received, Alpine may hypothecate any of my securities under circumstances which will permit the commingling thereof with securities carried for the account of other customers.

6.  I agree that all property which I own or in which I have an ownership interest, whether owned individually, jointly or in the name of another person or entity, which is any time may be in your possession or control for any purpose, including safekeeping, shall be subject to a continuing security interest, lien and right of set-off for the discharge and satisfaction of any debts or obligations however arising that I may owe to Alpine at any time and for any reason. Alpine may at its discretion hold such property until my debts or obligations to Alpine are fully satisfied or Alpine may apply such property and the proceeds of the liquidation of such property toward the satisfaction of my debts and obligations and I will remain liable to Alpine for any deficiency. You shall have the discretion in enforcing your security interest to determine which property is to be sold and the order in which it is to be sold and shall have all the rights and remedies available to a secured party under the Utah Uniform Commercial Code. Without your prior written consent, I will not cause or allow any of the collateral held in my account(s), whether now owned or hereafter acquired, to be or become subject to any liens, security interests, mortgages or encumbrances of any nature other than your security interest.

7.  In the event that I am required to pay tax upon any securities, commodities or contracts held by Alpine and carried in my account pursuant to the provision of any tax law applicable thereto, I will indemnify, defend, and hold Alpine harmless from any liability incurred by it by reason thereof, including, but not limited to attorneys' fees, costs, penalties, interest, or fines.  Alpine shall report to the Internal Revenue Service the proceeds of all sales transactions and all dividends paid.

8.  I agree to pay Alpine on demand any balance due on my account, together with any and all interest, costs, expenses, and attorneys' fees incurred by Alpine in collecting on my account.  I further agree to I indemnify, defend, and hold Alpine harmless from any claim, liability, or allegation, including, but not limited to, any cost, expense, oss, damage, fine, penalty, or attorneys' fees, that Alpine may incur as a result of carrying out or executing orders from me, or by reason of any conduct on my part.  In the event that any legal action is commenced against Alpine by me or on my behalf, I agree that if Alpine prevails in that legal action, I shall pay Alpine for any and all interest, costs, expenses and attorneys' fees incurred by it in connection with that action.

9.  Alpine is hereby authorized to send any and all communications referring to any way to my account to me at any address, including any email address, given hereon, or such other address(es) as I may hereafter give Alpine in writing, and all communications sent to me at any such address shall be deemed given to me personally, whether actually received by me.  Any representatives or employees of Alpine may communicate with me at any of the telephone numbers or addresses at any time for reference to any transactions or for whatever purpose. I consent and agree that Alpine may record any communication with me.

10.  I represent and warrant to Alpine that the information contained in this Agreement and related documents including, but not limited to, the Client Application Form, the W9 Signature Card and the Suitability Questionnaire is complete, true, and accurate, and I further represent and warrant that if at anytime while I have an account at Alpine events occur that cause the information provided to no longer be complete, true, and accurate, I will immediately notify Alpine in writing and provide Alpine with the updated complete, true and accurate information. I further represent and warrant to Alpine that I will not use my account with Alpine for any illegal purpose or for any type of money laundering or other such activities in violation of any state or federal law, rule, regulation, code, or statute.

11. (a) This agreement contains a predispute arbitration clause set forth in (i) below. By signing an arbitration agreement the parties acknowledge and agree as follows: (i) all parties to this agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed; (ii) arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited; (iii) the ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings; (iv) the arbitrators do not have to explain the reason(s) for their award; (v) the panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry; (vi) the rules of some arbitration forums may impose time limits for bringing a claim in arbitration; and (vii) in some cases, a claim that is ineligible for arbitration may be brought in court. The rules of the arbitration forum in which the claim is filed and any amendments thereto, are hereby incorporated herein.

(b) Based on the foregoing, I agree that any and all claims, causes of action, disputes, or controversies that may arise concerning any transaction or this Agreement, shall be submitted to binding arbitration before the NASD, and specifically agree that the locale for all hearings for said arbitration shall be in Salt Lake City, Utah. I further agree that the substantive laws of the State of Utah shall be the applicable and governing law in any arbitration.

12.  All transactions entered into under this Agreement shall be subject to any applicable constitution, rules, regulations, customs and usages of the exchange or market and its clearinghouse, if any, where such transactions are executed by Alpine or its agents and to all applicable laws, rules and regulations of governmental authorities and self-regulatory agencies. If any provision is enacted that would be inconsistent with any of the provisions of this Agreement, the provision so affected shall be deemed modified or superseded by the enactment, but the remaining provisions of this Agreement shall remain in effect. Except as herein provided, no provision of this Agreement may be waived, altered, modified or amended unless the same is in writing and signed by an authorized official of Alpine.

13.  I authorize you at your discretion to obtain reports and to provide information to others concerning my credit standing, background and business conduct. You may ask credit reporting agencies for consumer reports of my credit history. Upon my request you will inform me whether you have obtained any such consumer reports and if you have, you will inform me of the name and address of the consumer reporting agency that furnished the reports to you.

14.  The provisions of this Agreement shall be continuous, shall cover individual'y and collectively all accounts which I may open or reopen with Alpine, shall inure to the benefit of Alpine's present organization, and any successor organization or assigns; and shall be binding upon my heirs, executors, administrators, assigns or successors in interest. Should any term or provision of this Agreement be deemed or held to be invalid or unenforceable, the remaining terms and provisions shall continue in full force and effect. Except for statutes of limitation applicable to claims, this Agreement and all the terms herein shall be governed and construed in accordance with the laws of the State of Utah without giving effect to principles of conflict of laws. The statute of limitations applicable to any claim shall be that which would be applied by the courts of the state in which I reside or if I do not reside in the United States, the statute of limitations shall be that which would be applied by the courts in the state where the Alpine office servicing my account(s) is located.

15.  I understand that you may in your sole discretion prohibit or restrict trading of securities or substitution of securities in any of my accounts. You have the right to terminate any of my accounts (including multiple owner accounts) at any time by notice to me. The provisions of this agreement shall survive the termination of any account.

16.  Your failure to insist at any time upon strict compliance with any term of this Agreement, or any delay or failure on your part to exercise any power or right given to you in this Agreement, or a continued course of such conduct on your part shall at no time operate as a waiver of such power or right, nor shall any single or partial exercise preclude any other further exercise. All rights and remedies given to you herein are cumulative and not exclusive of any other rights or remedies which you otherwise have.

17.  I understand that Alpine shall not be liable for loss caused directly or indirectly by government restrictions, exchange or market rulings, suspension of trading, war, terrorist acts, strikes or other conditions, commonly known as "acts of God," beyond Alpine's control.

18.  I/we jointly and severally agree to indemnify Alpine and hold it harmless from any liability (including attorneys' fees) arising out of or related to any actual or alleged improper or unsuitable actions resulting from instructions given to Alpine by me/us.

19.  I agree that if I utilize your services to receive or issue funds by wire (wire transfers), I am responsible for the issuance of accurate and complete instructions in relation to said wire transfers and I will hold you harmless from all liabilities if I fail to fulfill this responsibility. I further agree that if I should incur a loss in connection with a wire transfer as a result of negligence or other activities on your part, your liability will be limited to the actual amount of the misdirected or misapplied funds and no other damages of any other nature including consequential damages will be recoverable.

GLOBAL TAP GLOBAL SECURITIES Inc.
Customer Name

Customer Signature

1/28/10
Date

Date                                    Customer Signature

01/28/2010   15:12      9543512605                                                    PAGE   12/25
JAN-28-2010 13:35 From:2433210075                      To:19543512605              Page: 7/20

# SUITABILITY DETERMINATION

Based upon the foregoing information which I have provided, Alpine Securities Corporation has made the determination that transactions in designated securities are suitable for me and that I have sufficient knowledge and experience in financial matters to enable myself to evaluate the risks of transactions in designated securities. In this regard, I have informed Alpine Securities that I understand that there is risk in connection with investments in designated securities which could involve the loss of my entire investment with respect to any particular designated security. This suitability determination should therefore not be construed by me as an indication that Alpine Securities Corporation believes any particular investment by me in a designated security is a safe investment or an investment that will result in a gain to me and does not constitute a recommendation to purchase any security.

THE FOREGOING STATEMENT IS REQUIRED TO BE PROVIDED TO YOU BY RULE 15G-9 UNDER THE SECURITIES EXCHANGE ACT OF 1934. IN ADDITION, IT IS UNLAWFUL FOR ALPINE SECURITIES CORPORATION TO EFFECT A TRANSACTION IN A DESIGNATED SECURITY SUBJECT TO RULE 15G-9 UNLESS ALPINE SECURITIES CORPORATION HAS RECEIVED, PRIOR TO THE TRANSACTION, A WRITTEN AGREEMENT TO THE TRANSACTION FROM YOU.

YOU SHOULD NOT SIGN AND RETURN THIS STATEMENT TO ALPINE SECURITIES CORPORATION IF IT DOES NOT ACCURATELY REFLECT YOUR FINANCIAL SITUATION, INVESTMENT EXPERIENCE, AND INVESTMENT OBJECTIVES. YOU AGREE TO NOTIFY US IN WRITING IF ANY OF THE ABOVE INFORMATION CHANGES.

Do you understand that investments in designated securities involve a higher than normal degree of risk, including the possibility that you could lose your entire investment in any particular designated security?

Yes [✓]          No [ ]

Date _1/28/10_

Signature of Customer

Printed Name of Customer

Date _____

Signature of Joint Subscriber (if any)

Printed Name of Joint Subscriber (if any)

Account approved for transactions in designated securities: ALPINE SECURITIES CORPORATION

By_____
Duly Authorized Officer

01/28/2010  15:12    9543512605                                                    PAGE  13/25
JAN-28-2010 13:05 From:2423279975                        To:19543312605            Page:8/20

## Certification of Corporate Authorization (General)

(See Rules 198 and 199 of Rules of Board of Governors of New York Stock Exchange)

I, __JASON SMITH__, being duly constituted Secretary of __GIBRALTAR GLOBAL SECURITIES INC.__, a corporation organized and existing under and by virtue CONMONWEALTH OF the of the Laws of the State of __BAHAMAS__ (hereinafter called this Corporation) do hereby

certify that the following is a true and complete copy of resolutions duly adopted at a meeting of the Board of Directors of this Corporation, duly called and held on __JAN 25, 20.0__ at which a quorum was present and voting;

that said resolutions are still in full force and effect and have not been rescinded; and that said resolutions are not in conflict with the Charter or By-Laws of this Corporation:

RESOLVED: That any of the following officers, to wit __MANAGING DIRECTOR WARREN DAVIS__ of this Corporation be, and they hereby are, fully authorized and empowered to transfer, convert, endorse, sell, assign, set over and deliver any and all shares of stock, bonds, debentures, notes, subscription warrants, stock purchase warrants, evidences of indebtedness or other securities now or hereafter standing in the name of or owned by this Corporation, and to make, execute and deliver, under the corporate seal of this Corporation or otherwise, any and all written instruments of assignment and transfer necessary or proper to effectuate the authority hereby conferred;

FURTHER RESOLVED: That whenever there shall be annexed to any instrument of assignment and transfer, executed pursuant to and in accordance with the foregoing resolution, a certificate of the Secretary or an Assistant Secretary of this Corporation in office at the date of such certificate, and such certificate shall set forth these resolutions and shall state that these resolutions are in full force and effect, and shall also set forth the names of persons who are then officers of this Corporation, then all persons to whom such instrument with the annexed certificate shall thereafter come, shall be entitled, without further inquiry or investigation and regardless of the date of such certificate, to assume and to act in reliance upon the assumption that the shares of stock or other securities named in such instrument were theretofore duly and properly transferred, endorsed, sold, assigned, set over and delivered by this Corporation and that with respect to such securities as and authority of these resolutions and of such officers is still in full force and effect.

I further certify that the following is a true and correct list of the present officers of this Corporation:

__WARREN DAVIS__         MANAGING DIRECTOR
                         President            Secretary

_____         Vice Pres. _____ Treasurer

The Company and its Board of Directors further irrevocably undertakes and agrees that Alpine Securities Corp. may rely on the actions authorized, authority granted and representations made in the foregoing resolutions until such time and the Corporation notifies Alpine Securities Corp. in writing that said resolutions have been modified, amended and/or revoked.

Date __1/28/10__

                                              _____
                                              (Signature of Secretary)

(Seal)

                         Signature Guaranteed:

01/28/2010  15:12     9543512605                                                    PAGE  14/25
JAN-28-2010 13:06 From:2423270975                    To:19543512605          Page:9/20

---

Form **W-8BEN**
(Rev. February 2006)
Department of the Treasury
Internal Revenue Service

## Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding

▶ Section references are to the Internal Revenue Code.   ▶ See separate instructions.
▶ Give this form to the withholding agent or payer. Do not send to the IRS.

OMB No. 1545-1621

Do not use this form for:                                                                    Instead, use Form:
• A U.S. citizen or other U.S. person, including a resident alien individual . . . . . . . . . . . . . . . . . . . . W-9
• A person claiming that income is effectively connected with the conduct
  of a trade or business in the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . W-8ECI
• A foreign partnership, a foreign simple trust, or a foreign grantor trust (see instructions for exceptions) . . . . . . W-8ECI or W-8IMY
• A foreign government, international organization, foreign central bank of issue, foreign tax-exempt organization,
  foreign private foundation, or government of a U.S. possession that received effectively connected income or that is
  claiming the applicability of section(s) 115(2), 501(c), 892, 895, or 1443(b) (see instructions) . . . . . . . . . W-8ECI or W-8EXP
Note: These entities should use Form W-8BEN if they are claiming treaty benefits or are providing the form only to
claim they are a foreign person exempt from backup withholding.
• A person acting as an intermediary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . W-8IMY
Note: See instructions for additional exceptions.

### Part I   Identification of Beneficial Owner (See instructions.)

| | |
|---|---|
| 1 Name of individual or organization that is the beneficial owner | 2 Country of incorporation or organization |
| Gibraltar Global Securities Inc. | Bahamas |

3  Type of beneficial owner:   ☐ Individual   ☑ Corporation   ☐ Disregarded entity   ☐ Partnership   ☐ Simple trust
☐ Grantor trust   ☐ Complex trust   ☐ Estate   ☐ Government   ☐ International organization
☐ Central bank of issue   ☐ Tax-exempt organization   ☐ Private foundation

4  Permanent residence address (street, apt. or suite no., or rural route). Do not use a P.O. box or in-care-of address.
214 Lagoon Ct. Sandyport

| | |
|---|---|
| City or town, state or province. Include postal code where appropriate.  Nassau | Country (do not abbreviate)  Bahamas |

5  Mailing address (if different from above)
P.O. Box SP-63806

| | |
|---|---|
| City or town, state or province. Include postal code where appropriate.  Nassau | Country (do not abbreviate)  Bahamas |

| | |
|---|---|
| 6  U.S. taxpayer identification number, if required (see instructions)  NA    ☐ SSN or ITIN  ☐ EIN | 7  Foreign tax identifying number, if any (optional) |

8  Reference number(s) (see instructions)

### Part II   Claim of Tax Treaty Benefits (if applicable)

9  I certify that (check all that apply):
a ☑ The beneficial owner is a resident of __Bahamas__ within the meaning of the income tax treaty between the United States and that country.
b ☐ If required, the U.S. taxpayer identification number is stated on line 6 (see instructions).
c ☐ The beneficial owner is not an individual, derives the item (or items) of income for which the treaty benefits are claimed, and, if
    applicable, meets the requirements of the treaty provision dealing with limitation on benefits (see instructions).
d ☐ The beneficial owner is not an individual, is claiming treaty benefits for dividends received from a foreign corporation or interest from a
    U.S. trade or business of a foreign corporation, and meets qualified resident status (see instructions).
e ☐ The beneficial owner is related to the person obligated to pay the income within the meaning of section 267(b) or 707(b), and will file
    Form 8833 if the amount subject to withholding received during a calendar year exceeds, in the aggregate, $500,000.

10  Special rates and conditions (if applicable—see instructions): The beneficial owner is claiming the provisions of Article _____ of the
    treaty identified on line 9a above to claim a _____% rate of withholding on (specify type of income): _____ .
    Explain the reasons the beneficial owner meets the terms of the treaty article: _____
    _____

### Part III   Notional Principal Contracts

11 ☐ I have provided or will provide a statement that identifies those notional principal contracts from which the income is not effectively
      connected with the conduct of a trade or business in the United States. I agree to update this statement as required.

### Part IV   Certification

Under penalties of perjury, I declare that I have examined the information on this form and to the best of my knowledge and belief it is true, correct, and complete. I
further certify under penalties of perjury that:
1 I am the beneficial owner (or am authorized to sign for the beneficial owner) of all the income to which this form relates,
2 The beneficial owner is not a U.S. person,
3 The income to which this form relates is (a) not effectively connected with the conduct of a trade or business in the United States, (b) effectively connected but is
not subject to tax under an income tax treaty, or (c) the partner's share of a partnership's effectively connected income, and
4 For broker transactions or barter exchanges, the beneficial owner is an exempt foreign person as defined in the instructions.
Furthermore, I authorize this form to be provided to any withholding agent that has control, receipt, or custody of the income of which I am the beneficial owner or
any withholding agent that can disburse or make payments of the income of which I am the beneficial owner.

Sign Here ▶ _____    __1/28/10__    _____
             Signature of beneficial owner (or individual authorized to sign for beneficial owner)    Date (MM-DD-YYYY)    Capacity in which acting

For Paperwork Reduction Act Notice, see separate instructions.          Cat. No. 25047Z          Form **W-8BEN** (Rev. 2-2006)

## THE COMPANIES ACT 1992

## STATUTORY DECLARATION

## PURSUANT TO SECTION 3 (3)

I, **DONNA HARDING-LEE**, a Counsel and Attorney of the Supreme Court of The Bahamas do solemnly and sincerely declare that to the best of my knowledge and belief neither of the signatories to the Memorandum of Association of **GIBRALTAR GLOBAL SECURITIES INC.** viz Derek Bernard Ryan and Michelle Ryan is an individual described in Section 3 (2) of the Companies Act 1992 and I make this solemn declaration conscientiously believing the same to be true and by virtue of the provisions of the Oaths Act.

Declared this 14th day )
of October, A.D. 2004 ) .........................................

Before Me,

NOTARY PUBLIC

COMMONWEALTH OF THE BAHAMAS

Registrar General's Department
I certify the foregoing to be a true copy of the original document.

Registrar General

SEP 2 8 2004

THE COMPANIES ACT 1992

Company Limited By Shares

MEMORANDUM OF ASSOCIATION

OF

GIBRALTAR GLOBAL SECURITIES INC

1. The name of the Company is **"GIBRALTAR GLOBAL SECURITIES INC."**

2. The Registered Office of the Company will be situate in the Island of New Providence one of the Islands of the Commonwealth of The Bahamas.

3. The object or purpose for which the Company is established is to engage in any act or activity that is not prohibited under any law for the time being in force in the Commonwealth of The Bahamas.

4. The liability of the members is limited.

5. The capital of the Company is Five thousand Dollars (B$5,000.00) divided into Five thousand (5,000) shares of One Dollar (B$1.00) each, with power to increase the capital and to divide the shares in the capital for the time being, whether original or increased, into several classes, and to attach thereto respectively any preferential, deferred, qualified, or special rights, privileges or conditions whether as to voting or otherwise.

6. The Company shall be a Private Company and accordingly no shares nor any class of shares shall be offered to the public for subscription.

7. The number of shareholders being signatories to this Memorandum and subscribing for shares hereunder shall be two (2), who hereby subscribe for One

- 2 -

(1) share each, each share having a par value of One Dollar (B$1.00) such having

an aggregate value of Two Dollars (B$2.00).

WE, the persons whose names and addresses are subscribed, are desirous of being

formed into a Company, in pursuance of this Memorandum of Association, and we

respectively agree to take the number of shares in the capital of the Company set opposite

our respective names:

| NAMES, ADDRESSES AND DESCRIPTIONS OF SUBSCRIBERS | NUMBER OF SHARES TAKEN BY EACH SUBSCRIBER |
|---|---|
| 1. Lynden Carey P. O. Box N-9609 Nassau, Bahamas Administrative Assistant | One (1) |
| 2. Anita Collis P. O. Box N-9609 Nassau, Bahamas Secretary | One (1) |
| TOTAL SHARES TAKEN: | Two (2) |

DATED the 14ᵗʰ day of October, A.D. 2004

Witness to the above signatures:

Michelle Ryan
P. O. Box N-9609
Nassau, Bahamas
Secretary

COMMONWEALTH OF THE BAHAMAS

Registrar General's Department
I certify the foregoing to be a true copy of the
original document.

Registrar General

SEP 2 8 2006

*2*

THE COMPANIES ACT 1992

———————

Company Limited By Shares

ARTICLES OF ASSOCIATION

OF

GIBRALTAR GLOBAL SECURITIES INC.

3

THE COMPANIES ACT 1992

COMPANY LIMITED BY SHARES

ARTICLES OF ASSOCIATION

OF

**GIBRALTAR GLOBAL SECURITIES INC.**

## INTERPRETATION

1. In these presents unless there be something in the subject or context inconsistent therewith:

"The Act" shall mean the Companies Act 1992 and any statutory modifications thereof.

"The Company" means the above-named Company.

"The Directors" means the Directors for the time being of the Company.

"The Auditors" means the persons for the time being performing the duties of auditors.

"The Office" means the registered office for the time being of the Company.

"The Register" means the Register of Members to be kept as required by Section 56 of

the Act.

"Month" means calendar month.

"Dividend" includes bonus if so determined by the Directors.

"The Secretary" includes an Assistant Secretary and any person appointed to perform the duties of Secretary of the Company.

"In Writing" and "Written" include printing, lithography, and other modes of representing or reproducing words in visible form.

"Paid up" means paid up and/or credited as paid up.

Words importing the singular number only include the plural number and vice versa.

Words importing the masculine gender only include the feminine gender.

Words importing persons include corporations.

2. In addition to the registered office of the Company in the Commonwealth, which shall be at such place as the Directors shall from time to time appoint, the Company may have an office for the transaction of business at any

*4*

other place, and meetings of the Company or of the Directors may be held either within or without the Commonwealth, and if without the Commonwealth at such place as the Directors may determine.

3.  The Directors shall have regard to the restrictions on the commencement of business imposed by Section 42 of the Act if, and in so far as, those restrictions are relevant to the Company.

## SHARES

4.  All the shares in the Company shall be numbered in regular series, and every forfeited or surrendered share shall continue to bear the number by which the same was originally distinguished.

5.  None of the funds of the Company shall be employed in the purchase of, or lent on, shares of the Company.

6.  Subject to any directions at any time and from time to time given by the Company in general meeting the shares shall be under the control of the Directors, who may allot or otherwise dispose of the same to such persons, on such terms and conditions, and at such times as the Directors think fit.

7.  The joint holders of a share shall be severally as well as jointly liable for payment of all instalments and calls due in respect of such share.

8.  Save as herein otherwise provided, the Company shall be entitled to treat the registered holder of any share as the absolute owner thereof, and accordingly shall not, except as ordered by a Court of competent jurisdiction, or as by the Act required, be bound to recognize any equitable or other claim to, or interest in, such share on the part of any other person.

## CERTIFICATES

9.  The certificates of title to shares shall be issued under the seal of the Company, and shall be signed by one of the Directors and countersigned by the Secretary.

10.  Every member shall be entitled to one certificate for all the shares registered in his name, or to several certificates, each for one or more of such shares. Every certificate of shares shall specify the number and denoting numbers of the shares in respect of which it is issued, and the amount paid up thereon and shall be numbered in regular series.

11.  If any certificate be worn out or defaced, then upon production thereof to the Directors, they may order the same to be cancelled, and may issue a new certificate in lieu thereof, and if any certificate be lost or destroyed, then, upon proof thereof to the satisfaction of the Directors and on such indemnity as the Directors deem adequate being given, a new certificate in lieu thereof shall be given to the party entitled to such lost or destroyed certificate.

12.   For every certificate issued under the last preceding Article there shall be paid to the Company the sum of Seventy-five Cents or such smaller sum as the Directors may from time to time determine.

13.   The certificate of shares registered in the names of two or more persons shall, unless otherwise directed by them, be delivered to the person first named on the register.

## CALLS

14.   (1)   The Directors may from time to time make such calls as they think fit upon the members in respect of all moneys unpaid on the shares held by them respectively and not by the conditions of allotment thereof made payable at fixed times. A call may be made payable by instalments.

      (2)   Each member shall pay the amount of every call so made on him to such persons and at such times and places as the Directors shall appoint.

      (3)   Notice of the persons appointed to receive payment of every call and of the times and places appointed for payment shall be sent to the members by the Company as hereinafter provided.

15.   A call shall be deemed to have been made at the time when the resolution of the Directors authorising such call was passed.

16.   Seven days' notice at least of any call shall be given.

17.   If the sum payable in respect of any call or instalment be not paid on or before the day appointed for payment thereof, the holder for the time being of the share in respect of which the call shall have been made, or the instalment shall be due, shall pay interest for the same at such rate, not exceeding ten per centum per annum, as the Directors shall determine, from the day appointed for the payment thereof to the time of actual payment, but the Directors may if they shall think fit, remit payment of such interest or any part thereof.

18.   On the trial or hearing of any action for the recovery of any money due for any call, it shall be sufficient to prove that the name of the member sued is entered in the register as the holder, or one of the holders, of the shares in respect of which such debt accrued; that the resolution making the call is duly recorded in the minute book; and that notice of such call was duly given to the member sued, in pursuance of these presents; and it shall not be necessary to prove the appointment

*6*

interest at such rate as the member paying the same in advance and the Directors agree upon.

## FORFEITURE AND LIEN

20. If any member fails to pay any call or instalment on or before the day appointed for the payment of the share, the Directors may at any time thereafter, during such time as the call or instalment remains unpaid, serve a notice on such member requiring him to pay the same, together with any interest that may have accrued and all expenses that have been incurred by the Company by reason of such non-payment.

21. The notice shall name a day (not being less than Twenty-one days from the date of the notice), and a place or places, on and at which such call or instalment and such interest and expenses as aforesaid are to be paid.

The notice shall also state that in the event of non-payment at or before the time and at the place appointed, the shares in respect of which such call or instalment is payable will be liable to forfeiture.

22. (1) If the requirements of any such notice as aforesaid are not complied with, any shares in respect of which such notice has been given may, at anytime thereafter, before payment of all calls or instalments, interest and expenses due in respect thereof, be forfeited by a resolution of the Directors to that effect. Such forfeiture shall include all dividends declared in respect of the forfeited shares and not actually paid before the forfeiture.

(2) A certificate in writing under the hand of one Director and countersigned by the Secretary stating that a share has been forfeited, shall be conclusive evidence of such forfeiture, and an entry of every such certificate shall be made in the minutes of the proceedings of the Directors.

23. When any share shall have been so forfeited, notice of the resolution shall be given to the member in whose name it stood immediately prior to the forfeiture, and an entry of the forfeiture, with the date thereof, shall forthwith be made in the register.

24. (1) Any shares so forfeited shall be deemed to be the property of the Company, and the Directors may sell, re-allot and otherwise dispose of the same in such manner as they think fit.

ten per centum per annum, and the Directors may enforce the payment thereof if they shall think fit.

26.   The Company shall have a first and paramount lien upon all the shares registered in the name of each member (whether solely or jointly with others) and upon the proceeds of sale thereof, for his debts, liabilities and engagements, solely or jointly with any other person, to or with the Company, whether the period for the payment, fulfilment or discharge thereof shall have actually arrived or not, and no equitable interest shall be created in any share except upon the footing and condition that Article 8 hereof is to have full effect.   And such lien shall extend to all dividends from time to time declared in respect of such shares.   Unless otherwise agreed, the registration of a transfer of shares shall operate as a waiver of the Company's lien, if any, on such shares.

27.   For the purpose of enforcing such lien, the Directors may sell the shares subject thereto in such manner as they think fit; but no sale shall be made until such period as aforesaid shall have arrived, and until notice in writing of the intention to sell shall have been served on such member, his executors or administrators, and default shall have been made by him or them in the payment, fulfilment, or discharge of such debts, liabilities or engagements for seven days after such notice.

28.   The net proceeds of any such sale shall be applied in or towards satisfaction of the said debts, liabilities or engagements and the residue (if any) paid to such member, his executors, administrators or assigns.

29.   Upon any sale after forfeiture or for enforcing a lien in purported exercise of the powers hereinbefore given, the Directors may appoint some person to execute an instrument of transfer of the shares sold and cause the purchaser's name to be entered in the register in respect of the shares sold, and the purchaser shall not be bound to see to the regularity of the proceedings, or to the application of the purchase money, and after his name has been entered in the register in respect of such shares, the validity of the sale shall not be impeached by any person, and the remedy of any person aggrieved by the sale shall be in damages only and against the Company exclusively.

## TRANSFER OF SHARES

30.   Any member may transfer all or any of his shares by instrument in writing in any usual or common form or any other form, which the Directors may approve.

*8*

33. The Directors may decline to register a transfer of any share to any person of whom they do not approve. They may also decline to register any transfer of shares without assigning any reason therefor.

34. If the Directors refuse to register a transfer they shall within two months after the date on which the transfer was lodged with the Company send to the transferee notice of the refusal.

35. Every instrument of transfer shall be left at the office for registration, accompanied by the certificate of the shares to be transferred, and such other evidence as the Directors may require to prove the title of the transferor or his right to transfer the shares.

## TRANSMISSION OF SHARES

36. In case of the death of a member the survivor or survivors where the deceased was a joint holder, and the legal personal representatives of the deceased where he was a sole holder, shall be the only persons recognised by the Company as having any title to his interest in the shares; but nothing herein contained shall release the estate of a deceased joint holder from any liability in respect of any share which had been jointly held by him with other persons.

37. Any person becoming entitled to a share in consequence of the death of any member, or in any other way than by transfer, may with the consent of the Directors, and upon the production of such evidence as may from time to time be required by the Directors, be registered as a member, or, subject to the provisions as to transfers hereinbefore contained, may transfer such share to some other person by executing to the latter an instrument of transfer.

38. The Directors may, if they think fit, withhold the payment of any dividend, payable in respect of any share to which any person may be entitled by transmission until such time as such person shall become the registered owner, or shall have effectually transferred such share, after which time such person, so becoming registered or transferring, shall receive such dividend.

## INCREASE OF CAPITAL

39. The Company may, from time to time by resolution, of the members increase the capital of the Company by the creation of new shares of such amount as may be deemed expedient.

40. The new shares shall be issued upon such terms and conditions, and with such rights, priorities and privileges annexed thereto, as the general meeting

9

42.   Except so far as otherwise provided by the conditions of issue, or by these Articles, any capital raised by the creation of new shares shall be considered part of the original capital, and shall be subject to the provisions herein contained with reference to the payment of calls and instalments, transfer and transmission, forfeiture, lien and otherwise. Unless otherwise provided in accordance with these Articles the new shares shall be Ordinary Shares.

43.   The Company may, from time to time, by resolution of the members consolidate and divide all or any of its share capital into shares of larger amount than its existing shares.

## ALTERATION AND REDUCTION OF CAPITAL

44.   The Company may pass all resolutions for the alteration or reduction of its Share Capital as are set forth in Sections 49 and 50 of the Act.

## MODIFICATION OF RIGHTS

45.   Whenever the capital, by reason of the issue of Preference shares or otherwise, is divided into different classes of shares, all or any of the rights and privileges attached to each class may be modified, commuted, affected, abrogated or dealt with either with the consent in writing of the holders of a majority in nominal value of the issued shares of the class, or the sanction of a resolution of the members passed at a separate general meeting of the holders of shares of that class. All the provisions hereinafter contained as to general meetings shall, mutatis mutandis, apply to every such meeting but so that the Quorum thereof shall be members holding, or representing by proxy one-tenth in nominal amount of the issued shares of the class, (provided that if at any adjourned meeting of such holders a quorum as above defined is not present those members who are present in person or by proxy shall be a quorum) and that the holders of shares of the class shall, on a poll, have one vote for every share of the class held by them respectively. This Article is not to derogate from any power the Company would have had if this Article were omitted.

## MEETINGS

46.   The statutory general meeting of the Company shall be held within the period required by Section 70 of the Act.

47.   Subsequent General Meetings shall be held once at least in each and every calendar year at such time and place as may be prescribed by the Directors. Such general meetings may be held anywhere in the world. At these meetings the Directors shall be elected for the ensuing year and the general business of the

writing by members owning not less than one-fourth in nominal value of the subscribed and issued shares of the Company, convene an extraordinary meeting.

50.   Any such requisition shall express the object of the meeting required, and shall be signed by the director or members making the same, and shall be sent by post or delivered to the Secretary of the Company, or sent by post to or delivered at the office.

51.   Upon the receipt of such requisition the Directors shall forthwith proceed to convene an extraordinary meeting. If they do not proceed to convene the same within seven days from the date of the receipt of the requisition the requisitionist or requisitionists, or any member or members, being the owners of not less than one-fourth in nominal value of the subscribed and issued shares of the Company, may themselves convene a meeting in The Bahamas aforesaid, or at such other place as they may determine.

52.   Seven clear days' notice at the least of any meeting specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of such business, shall be given to the members in manner hereinafter mentioned, or in such other manner, if any, as may be prescribed by the Company in general meeting; but the accidental omission to give notice of any meeting to, or the non-receipt of any such notice by any person entitled thereto shall not invalidate the proceedings at that meeting.

53.   All business shall be deemed to be special that is transacted at an extraordinary meeting. All business that is transacted at an ordinary meeting shall also be deemed special, with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets and the ordinary report of the auditors and the election of Directors and Officers.

54.   Where it is proposed to pass a special resolution the two meetings may be convened by one and the same notice, and it is to be no objection to such notice that it only convenes the second meeting contingently on the resolution being passed by the requisite majority at the first meeting.

55.   Subject to the provisions of The Companies Act, when a majority of the shareholders in person by proxy representing at least one-half of the issued capital of the Company sign the minutes of any ordinary or extraordinary meeting the same shall be deemed to have been duly held notwithstanding that the members have not actually come together or that there may have been technical defects in the proceedings. And a resolution in writing signed by members holding the requisite majority in nominal value of the subscribed and issued shares of the Company shall be as valid and effectual as if it had been passed at a meeting of the ...

II

## PROCEEDINGS AT GENERAL MEETINGS

57.  No business shall be transacted at any general meeting unless a quorum is present when the meeting proceeds to business, except to take measures to obtain a quorum.

58.  A quorum shall consist of three members present in person or by proxy for all purposes.

59.  The President or Vice-President if they have been elected or appointed shall preside as Chairman at every General Meeting of the Company.  In the event that no President or Vice-President has been elected or appointed or in their absence the Directors present shall choose some Director present to be Chairman, or if no Director be present, or if all the Directors present decline to take the chair the members present shall choose some one of their number to be Chairman.

60.  If within half an hour from the time appointed for the meeting a quorum is not present, the meeting shall stand adjourned to such day and at such time and place as shall be decided by the Chairman; and if at such adjourned meeting a quorum is not present, those members who are present shall be a quorum and may transact the business for which the meeting was called but so that not less than two individuals shall constitute the quorum.

61.  The Chairman may, with the consent of the meeting, adjourn any meeting from time to time and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.

62.  Every question submitted to a meeting shall unless a poll is (before or on the declaration of the result of the show of hands) demanded, be decided by a show of hands, and in the case of an equality of votes the Chairman shall have a casting vote in addition to the vote or votes to which he may be entitled as a member.

63.  At any general meeting unless a poll is demanded by the Chairman or by at least three members present in person or by proxy, or by any member or members present in person or by proxy and representing not less than one-tenth of the total voting rights of all members having the right to vote at the meeting a declaration by the Chairman that a resolution has been carried and an entry to that effect in the book of proceedings of the company shall be sufficient evidence of the fact without proof of the number or proportion of the votes recorded in favour of or against such resolution.

*12*

## VOTES OF MEMBERS

65.   On a show of hands every member entitled to vote present in person or by proxy shall have one vote, and upon a poll every member entitled to vote present in person or by proxy shall have one vote for every share held by him.

66.   Votes may be given either personally or by permanent or ad hoc written proxy.

67.   The instrument appointing a proxy and the power of attorney if any under which it is signed or a notarially certified copy thereof shall be deposited with the Secretary before or at the meeting for which it is to be used, and if permanent may be recorded with the Secretary.

68.   A vote given in accordance with the terms of an instrument of proxy shall be valid notwithstanding the previous death or insanity of the principal or revocation of the instrument of proxy, or of the authority under which the instrument of proxy was executed, or transfer of the share in respect of which the vote is given, provided no intimation in writing of the death, insanity, revocation or transfer shall have been received at the office before the meeting or adjourned meeting at which the instrument of proxy is used.

69.   An instrument appointing a proxy may be in any form, which the Directors think fit to approve. The proxy shall be deemed to include the right to demand, or joining in demanding a poll, and shall (except and to the extent to which the proxy is specially directed to vote for or against any proposal) include power generally to act at the meeting for the person giving the proxy. A proxy shall unless the contrary is stated thereon, be valid as well for any adjournment of the meeting as for the meeting to which it relates, and need not be witnessed.

70.   The instrument appointing a proxy shall be in writing under the hand of the appointer or of his attorney, or, if the appointer is a corporation, either under seal, or under the hand of an officer or attorney duly authorised. A proxy need not be a member of the Company. Any corporation which is a member of the Company may by resolution of its Directors or other governing body authorise such person as it thinks fit to act as its representative at any meeting of the Company, or of any class of members of the Company, and the person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual member of the Company.

## DIRECTORS

appointed. A Director or Directors so appointed (except the first Directors) shall hold office for a year (unless removed as aforesaid) or until his or their successors are duly elected or until the office is duly vacated as provided by Article 74. Any appointment or removal by a member or members as aforesaid, shall be effected by an instrument in writing signed by the member or members making the same, or in the case of a member being a Company, signed by one of its Directors on its behalf, and shall take effect upon lodgement at the Office.

72.    Unless and until the Company in General Meeting shall otherwise determine, the Directors shall be not less than two nor more than nine in number, and they need not be shareholders.

73.    The remuneration of the Directors shall be determined by the Company in general meeting.

74.    The office of director shall be ipso facto vacated if the Director: -

(1)    Becomes bankrupt, or makes any arrangement or composition with his creditors generally; or

(2)    Resigns his office by notice in writing under his hand sent to or left at the office; or

(3)    Becomes lunatic or of unsound mind; or

(4)    Is absent from meetings of the Directors for six successive months without leave and his alternate Director (if any) shall not, during such period, have attended in his stead, and the Directors resolve that his office be vacated; or

(5)    Is requested in writing by members holding or representing more than one-half in value of the subscribed and issued shares of the Company to vacate his office.

(6)    Is or otherwise becomes disqualified or removed pursuant to Sections 87, 88 or 89 of the Act.

However, the continuing Directors may act notwithstanding any vacancy in their body, but, and if so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Director or Directors may act for the purpose of increasing the number of Directors to that number, or of summoning a General Meeting of the Company, but for no other purpose.

any Director shall be in any way interested, be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established. But it is declared that the nature of his interest must be disclosed by him at the meeting of the directors at which the contract or arrangement is determined on, if his interest then exists, or in any other case at the first meeting of the directors after the acquisition of his interest, and after such declaration of interest he shall be entitled to vote either as director or as shareholder in respect of any contract or arrangement in which he is so interested as aforesaid.

77.　Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director.

78.　A Director of this Company may be or become a Director of any Company promoted by this Company or in which it may be interested as a vendor, shareholder or otherwise, and no such Director shall be accountable for any benefits received as a Director or member of such Company.

### MANAGING DIRECTOR

79.　The Directors may from time to time appoint one or more of their number to the office of Managing Director or Manager for such term as they think fit, and, subject to the terms of any agreement entered into in any particular case, may revoke such appointment, and a Director so appointed shall, subject to the provisions of any agreement between him and the Company, be subject to the same provisions as to resignation and removal as the other Directors of the Company, and if he cease from any cause to be a Director he shall ipso facto and immediately cease to be a Managing Director.

80.　A Managing Director or Manager shall receive such remuneration (whether by way of salary, commission or participation in profits, or partly in one way and partly in another) as the Directors may determine, and either in addition to or in lieu of his remuneration as a Director.

81.　The Directors may entrust to and confer upon a Managing Director or Manager any of the powers exercisable by them upon such terms and conditions and with such restrictions, as they think fit, and either collaterally with or to the exclusion of their own powers, and may from time to time revoke, withdraw, alter or vary all or any of such powers.

### PROCEEDINGS OF DIRECTORS

84. A meeting of the Directors for the time being at which a quorum is present shall be competent to exercise all or any of the authorities, powers and discretions by or under the regulations of the Company for the time being vested in or exercisable by the Directors generally.

85. The President or Vice-President (if elected or appointed) shall preside at all meetings of the Directors. In the absence of the President and Vice-President the Directors shall choose some one of their number to be chairman of the meeting.

86. The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit, and they may, from time to time, revoke such delegation or revoke the appointment of and discharge any such committees either wholly or in part and either as to persons or purposes; but every committee so formed, shall in the exercise of the powers so delegated, conform to any regulations that may from time to time be imposed on it by the Directors.

87. All acts done by any meeting of the Directors or of a committee of Directors, or by any person acting as a Director, shall, notwithstanding that it shall afterwards be discovered that there was some defect in the appointment or continuance in office of any such Director or committee of Directors or person acting as aforesaid, or that they or any of them were or was disqualified or had vacated office, or were not entitled to vote, or had not received notice of the meeting, be as valid as if every such person had been duly appointed or had duly continued in office and was qualified and had continued to be a Director and had been entitled to be a Director and had received such notice.

88. It shall not be necessary for the Directors to hold any formal meetings and participation in meetings of Directors shall be permitted subject to the provisions of Section 101 of the Act.

89. Any minutes of the meetings of Directors if purporting to be signed by the Chairman thereof, or by the Chairman of the next succeeding meeting, shall be sufficient evidence without any proof of the facts therein stated.

90. When all the Directors (including alternate Directors) sign the minutes of a meeting of the Directors the same shall be deemed to have been duly held notwithstanding that the Directors (including alternate Directors) have not actually come together or that any of the Directors (or alternate Directors) were not given notice of the meeting or that there may have been technical defects in the proceedings. And a resolution in writing, signed by all the Directors for the time being entitled to receive notice of a meeting including any alternate Director if entitled shall be as valid and effectual as if it had been passed at a meeting of t...

92.    If any Director, being willing, shall be called upon to perform extra services, or to make any special exertions, in going or residing abroad or otherwise, for any of the purposes of the Company, the Company shall remunerate the Director so doing, either by a fixed sum or by a percentage of profits, or otherwise as may be determined by the Directors, and such remuneration may be either in addition to or in substitution for his or their share in the remuneration above provided.

93.    A Director who is at any time absent from the Commonwealth of the Bahamas shall not during such absence be entitled to notice of any meeting of the Directors, but the views of a Director not present at a meeting of the Directors and transmitted by letter, telefax or cable shall be given effect to at any meeting of the Directors as if such Director had been personally present at such meeting and voted in accordance with such views.

## POWERS OF DIRECTORS

94.    The business of the Company shall be managed by the Directors, who may pay all expenses incurred in promoting and registering the Company, and may exercise all such powers of the Company as are not by the Act or by these Articles required to be exercised by the Company in General Meeting, subject nevertheless to any regulations of these Articles to the provisions of the Act, and to such regulations, being not inconsistent with the aforesaid regulations or provisions, as may be prescribed by the Company in General Meeting but no regulation made by the Company in General Meeting shall invalidate any prior act of the Directors which would have been valid if that regulation had not been made.

95.    Without prejudice to general powers conferred by the last preceding clause, and the other powers conferred by these presents, it is hereby expressly declared that the Directors shall have the following powers, that is to say power -

(1)    To pay the costs, charges and expenses preliminary and incidental to the promotion, formation, establishment and registration of the Company.

(2)    To purchase or otherwise acquire for the Company any property, rights or privileges, which the company is authorised to acquire, at such price and generally on such terms and conditions as they think fit.

(3)    At their discretion to pay for any property, rights or privileges acquired by, or services rendered to the Company, either wholly or partially in cash or in shares, bonds, debentures, or other securities of the Com...

time to time think fit, and determine their powers and duties, and fix their salaries or emoluments, and to require security in such instances and to such amount as they think fit.

(5)    From time to time to provide for the management of the affairs of the Company abroad in such manner as they think fit, and in particular to appoint any persons to be the Attorneys or agents of the Company with such powers (including power to subdelegate) and upon such terms as may be thought fit.

(6)    To appoint any person or persons (whether incorporated or not) to accept and hold in trust for the Company any property belonging to the Company, or in which it is interested, or for any other purposes, and to execute and all such deeds and things as may be requisite in relation to any such trust, and to provide for the remuneration of such trustee or trustees.

(7)    To refer any claims or demands by or against the Company to arbitration, and observe and perform the awards.

(8)    To enter into all such negotiations and contracts, and rescind and do all such acts, deeds, and things in the name and on behalf of the Company as they may consider expedient for or in relation to any of the matters aforesaid, or otherwise for the purposes of the Company.

(9)    To make and give receipts, releases and other discharges for money payable to the Company, and for the claims and demands of the Company.

(10)    To invest and deal with any of the moneys of the Company not immediately required for the purposes thereof, upon such securities (not being shares in the Company) and in such manner as they may think fit, and from time to time to vary or realise such investment.

## BORROWING POWERS

96.    The Directors or any attorney duly appointed and authorised by the Company may from time to time at their or his discretion, raise or borrow or secure the payment of any sum or sums of money for the purposes of the Company.

97.    The Directors may raise or secure the payment or re-payment of such moneys in such manner and upon such terms and conditions in all respects as they think fit, and in particular by the issue of bonds, debentures or debenture stock, notes or any mortgage, charge, security or other obligations of the Company, charged upon all or any part of the undertaking and property of the Company (both present and future), including its uncalled capital for the time being.

98.    Debentures and other securities may be made assignable free from any equities between the Company and the person to whom the same may be issued.

18

99.     Any debentures, bonds or other securities may be issued at a discount, premium, or otherwise, and with any special privileges as to redemption, surrender, drawings, allotment of shares, attending and voting at general meetings of the Company, appointment of Directors and otherwise.

100.     When any uncalled capital of the Company is charged, all persons taking any subsequent charge thereon shall take the same subject to such prior charge, and shall not be entitled by notice to the members or otherwise to obtain priority over such prior charge.

## ALTERNATE DIRECTORS

101.    A Director may appoint any person approved by the other Directors to be an alternate Director and may at any time remove any alternate Director so appointed. An alternate Director shall (subject to his giving to the Company an address within the Commonwealth at which notices may be served on him) be entitled to notice of meetings of the Directors, and in the absence of the Director who appointed him, and provided the views of such Director shall not have been transmitted pursuant to Article 93, the alternate Director shall be entitled to attend and vote at any such meeting, and generally at such meeting to have and exercise all the powers, rights and duties of the Director appointing him. Every such alternate Directors shall also be entitled in the absence from the Commonwealth of The Bahamas of the Director appointing him to sign on his behalf a resolution in writing of the Directors. An alternate Director shall ipso facto vacate office if and when the appointer vacates office as a Director, and any appointment or removal under this Article shall be effected at any time by notice in writing or by telefax or cable. An alternate Director shall not except by virtue of an agreement with the Director appointing him to part of the remuneration which would otherwise be payable to such Director, be entitled to receive remuneration from the Company.

## LOCAL MANAGEMENT

102.    (1)    The Directors may, from time to time, provide for the management of the affairs of the company abroad in such manner as they shall think fit, and the provisions contained in the five next following paragraphs shall be without prejudice to the general powers conferred by this paragraph.

         (2)    The Directors, from time to time, and at any time, may establish any local boards or agencies for managing any of the affairs of the Company abroad, and may appoint any persons to be members of such local board, or any managers or agents, and may fix their remuneration.

         (3)    The Directors, from time to time, and at any time, may delegate to any person so appointed any of the powers, authorities, and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill up any vacancies therein, and to act notwithstanding vacancies, and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit, and the Directors may

20

## THE VICE-PRESIDENT

108.     The Vice-President if and when elected or appointed in the absence or disability of the President may perform the duties and exercise the powers of the President, and shall perform such other duties as may be prescribed by the Directors.

## THE TREASURER

109.     The Treasurer if and when elected or appointed shall have the custody of the funds and securities of the Company and shall deposit to the credit of the Company, with a bank to be selected by the Directors, all the funds of the Company. He shall keep regular books of account and shall sign or counter-sign such documents or instruments as require his signature, and shall perform such other duties as may be prescribed by the Directors.

## THE SECRETARY

110.     The Secretary shall issue the notices for all meetings of the shareholders and Directors. He shall attend and keep the minutes of the meetings of the shareholders and Directors and shall have charge of the seal and books of the Company. He shall sign with a Director, such instruments and documents as require his signature, and shall make such reports and perform such other duties as may be prescribed by the Directors.

## THE SEAL

111.     The Seal of the Company shall not be used without the sanction of the Directors.

112.     Unless otherwise determined by a resolution of the Directors, a Director shall sign and seal all deeds, documents and other instruments and papers authorised by the Directors and requiring execution by the Company, and every instrument to which the seal shall be affixed shall be countersigned by another Director or the Secretary or Treasurer of the Company. The Company is hereby authorised to adopt and use an official Seal in accordance with the provisions of Section 26 of the Act.

113.     All deeds executed on behalf of the Company may be in such form, and contain such powers, provisoes, conditions, covenants, clauses and agreements as the Directors or the Company in general meeting shall think fit.

## DIVIDENDS

114.     The Company in general meeting may on the recommendation of the Directors declare a dividend to be paid to the members and may fix the time for payment.

115.     The Directors may from time to time pay to the members such interim dividends as in their judgment the position of the Company justifies.

credit of the profit and loss account or otherwise available for distribution, and accordingly that such sums be set free for distribution amongst the members who would have been entitled thereto if distributed by way of dividend and in the same proportions on condition that the same be not paid in cash but be applied either in or towards paying up any amounts for the time being unpaid on any shares held by such members respectively or paying up in full unissued shares or debentures of the Company to be allotted and distributed credited as fully paid up to and amongst such members in the proportion aforesaid, or partly in the one way and partly in the other, and the Directors shall give effect to such resolution.

124.   Whenever such a resolution as aforesaid shall have been passed the Directors shall make all appropriations and applications of the undivided profits resolved to be capitalised thereby, and all allotments and issues of fully-paid shares or debentures, if any, and generally shall do all acts and things required to give effect thereto, with full power to the Directors to make such provision by the issue of fractional certificates or by payment in cash or otherwise as they think fit for the case of shares or debentures becoming distributable in fractions.

## ACCOUNTS

125.   The Directors shall cause true accounts to be kept:

(1)   Of the sums of money received and expended by the Company, and the matters in respect of which such receipt and expenditure take place;

(2)   Of the assets and liabilities of the Company; and

(3)   Of all other matters necessary for showing the true state and condition of the Company.

126.   The Books of account shall be kept at one of the offices of the Company, and, subject to any reasonable restrictions as to the time and manner of inspecting the same that may be imposed by the Directors, shall be open to the inspection of the members during the hours of business.

127.   Once at the least in every year the Directors shall, unless waived by resolution of the shareholders in general meeting lay before the Company in general meeting a statement of the income and expenditure for the past year, made up to a date not more than six months before such meeting.

128.   Unless waived by a resolution of the shareholders in general meeting, a balance sheet shall be made out in every year and shall be laid before the Company in general meeting, and such balance sheet shall contain a summary of the property and liabilities of the Company.

129.   Unless waived by a resolution of the shareholders in general meeting, the Directors shall make all necessary arrangement for an annual audit of the books and accounts of the Company.

130.   Any auditor appointed need not be a shareholder of the Company.

## NOTICES

131. A notice may be served by the Company upon any member either personally or by sending it through the post in prepaid envelope or wrapper addressed to such member at his last known address.

132. The signature to any such notice to be given by the Company may be written, typewritten or printed.

133. Where a notice is sent by post, service of the notice shall be deemed to be effected by properly addressing, prepaying and posting a letter containing the notice, and to have been effected in the case of a notice of a meeting at the expiration of Twenty-four hours after the letter containing the same is posted, and in any other case at the time at which the letter would be delivered in the ordinary course of post.

134. A notice may be given by the Company to the joint holders of a share by giving the notice to the joint holder first named in the Register in respect of the share.

135. Any notice or document sent by post to, or left at the registered address of any member, in pursuance of these Articles, shall, notwithstanding such member be then deceased or bankrupt and whether or not the Company have notice of his decease or bankruptcy, be deemed to have been duly served in respect of any shares, whether held solely or jointly with other persons by such member, until some other person be registered in his stead as the holder or joint holder thereof, and such service shall for all purposes be deemed a sufficient service of such notice or document on all persons interested (whether jointly with or as claiming through or under him) in any such share.

136. Notice of meetings of members shall be given by the Secretary at least seven days before the date of such meeting.

137. Notice of special business shall state the object for which the meeting is called.

138. A meeting of members whether ordinary or extraordinary or of Directors may be held without previous notice if all the members or Directors, as the case may be, are present in person or in the case of a meeting of members are present either in person or by proxy.

## WINDING-UP

139. If the Company shall be wound up, and the assets available for distribution amongst the members as such shall be insufficient to repay the whole of the paid up capital, such assets shall be distributed so that, as nearly as may be, the losses shall be borne by the members in proportion to the capital paid up, or which ought to have been paid up, at the commencement of the winding-up on the shares held by them respectively. And if in a winding-up the assets available for distribution amongst the members shall be more than sufficient to repay the whole of the capital paid up at the commencement of the winding-up, the excess shall be distributed amongst the members in proportion to the capital at the commencement

of the winding-up paid up on the shares held by them respectively. But this Article is to be without prejudice to the rights of the holders of shares issued upon special terms and conditions.

140. If the Company shall be wound up the Liquidator may, with the sanction of a Resolution of the members of the Company and any other sanction required by the Act, divide amongst the members in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose, set such value as he deems fair upon any property to be divided as aforesaid, and may determine how such division shall be carried out as between the members or different classes of members. The Liquidator may, with the like sanction, vest the whole or any part of the assets in trustees upon such trusts for the benefit of the members or any of them as the Liquidator, with the like sanction, shall think fit, but so that no member shall be compelled to accept any shares or other securities whereon there is any liability.

## INDEMNITY

141. Subject to the limitations (if any) on indemnities conferred by Sections 118 to 121 (inclusive) of the Act every Director, manager, secretary and other officer or servant of the Company shall be indemnified by the Company against, and it shall be the duty of the Directors out of the funds of the Company to pay all costs, losses and expenses which any such Director, manager, secretary, officer or servant may incur or become liable to by reason of any contract entered into, or act or thing done by him as such Director, manager, secretary, officer or servant, or in any way in the discharge of his duties, including travelling expenses; and the amount for which such indemnity is provided shall immediately attach as a lien on the property of the Company, and have priority as between the members over all other claims.

142. No Director or other officer of the Company shall be liable for the acts, receipts, neglects or defaults of any other Director or officer or for joining in any receipt or other act for conformity, or for any loss or expense happening to the Company through the insufficiency or deficiency of title to any property acquired by order of the Directors for or on behalf of the Company, or for the insufficiency or deficiency of any security in or upon which any of the moneys of the Company shall be invested, or for any loss or damage arising from the bankruptcy, insolvency, or tortious act, of any person with whom any moneys, securities or effects shall be deposited, or for any loss occasioned by an error of judgment, omission, default or oversight on his part, or for any other loss, damage or misfortune whatsoever which shall happen in the execution of his office or in relation thereto, unless the same happen through his own dishonesty.

-25-

WE, the persons whose names and addresses are subscribed, are desirous of being

formed into a Company, in pursuance of this Articles of Association, and we

respectively agree to take the number of shares in the capital of the Company set opposite

our respective names:

| NAMES, ADDRESSES AND DESCRIPTIONS OF SUBSCRIBERS | NUMBER OF SHARES TAKEN BY EACH SUBSCRIBER |
|---|---|
| 1  Lynden Carey<br>P. O. Box N-9609<br>Nassau, Bahamas<br>Administrative Assistant | One (1) |
| 2  Anita Collie<br>P. O. Box N-9609<br>Nassau, Bahamas<br>Secretary | One (1) |
| TOTAL SHARES TAKEN: | Two (2) |

DATED the 14th day of October, A.D. 2004

Witness to the above signatures:

Michelle Ryan
P. O. Box N-9609
Nassau, Bahamas
Secretary

COMMONWEALTH OF THE BAHAMAS

Registrar General's Department
I certify the foregoing to be a true copy of the
original document.

Registrar General

SEP 2 8 2006

-25-

WE, the persons whose names and addresses are subscribed, are desirous of being

formed into a Company, in pursuance of this Articles of Association, and we

respectively agree to take the number of shares in the capital of the Company set opposite

our respective names:

| NAMES, ADDRESSES AND DESCRIPTIONS OF SUBSCRIBERS | NUMBER OF SHARES TAKEN BY EACH SUBSCRIBER |
|---|---|
| Lynden Carey P. O. Box N-9609 Nassau, Bahamas Administrative Assistant | One (1) |
| Anita Collie P. O. Box N-9609 Nassau, Bahamas Secretary | One (1) |
| TOTAL SHARES TAKEN: | Two (2) |

DATED the 14th day of October, A.D. 2004

Witness to the above signatures:

Michelle Ryan
P. O. Box N-9609
Nassau, Bahamas
Secretary

COMMONWEALTH OF THE BAHAMAS

Registrar General's Department
I certify the foregoing to be a true copy of the
original document.

Registrar General

SEP 2 8 2006

---


-25-

WE, the persons whose names and addresses are subscribed, are desirous of being

formed into a Company, in pursuance of this Articles of Association, and we

respectively agree to take the number of shares in the capital of the Company set opposite

our respective names:

| NAMES, ADDRESSES AND DESCRIPTIONS OF SUBSCRIBERS | NUMBER OF SHARES TAKEN BY EACH SUBSCRIBER |
|---|---|
| Lynden Catey<br>P. O. Box N-9609<br>Nassau, Bahamas<br>Administrative Assistant | One (1) |
| Anita Collie<br>P. O. Box N-9609<br>Nassau, Bahamas<br>Secretary | One (1) |
| TOTAL SHARES TAKEN: | Two (2) |

DATED the 14th day of October, A.D. 2004

Witness to the above signatures:

Michelle Ryan
P. O. Box N-9609
Nassau, Bahamas
Secretary

COMMONWEALTH OF THE BAHAMAS

Registrar General's Department
I certify the foregoing to be a true copy of the
original document.

Registrar General

SEP 2 8 2006

No. 52,253

Commonwealth of The Bahamas

# Certificate of Incorporation

I, ELIZABETH E.M. THOMPSON.............................................................

Registrar General for The Bahamas, do hereby certify that a Memorandum of Association of

..........................GIBRALTAR GLOBAL SECURITIES INC................................................

................................................................................................has this day been registered

in my office under the provisions of the Companies Act 1992.................................................

Whereby the said Parties have become and are an incorporated Company under...........................

the name and style of......GIBRALTAR GLOBAL SECURITIES INC.........................................

And I further certify that the Liability of the said Company is Limited.

Given under my hand and seal of office at the City of Nassau

the............15TH.............................day of..........OCTOBER.............................A.D. 20 04......

Elizabeth Thompson

Registrar General.



This Passport contains 32 pages
Ce passeport contient 32 pages

PASSPORT
PASSEPORT

COMMONWEALTH
OF THE BAHAMAS
LE COMMONWEALTH
DES BAHAMAS

No. of passport
Nr. du passeport

Name of holder
Nom du titulaire

MAIDEN NAME
NÉE

National Status    Nationalité
Citizen of The Commonwealth of The Bahamas



2

3

DESCRIPTION - SIGNALEMENT

Bearer Nuturt
Occupation
Profession          Portfolio Manager

Place of birth
Lieu de naissance   Nassau Bahamas

Date of birth
Date de naissance   ████████████

Country of Residence
Pays de Résidence   Bahamas

Height
Taille              6      ft    2      ins.

Colour of eyes
Couleur des yeux    Brown

Special peculiarities
Signes particuliers None

Bearer
Titulaire

Usual signature of bearer
Signature du titulaire



4

COUNTRIES FOR WHICH THIS
PASSPORT IS VALID

*PAYS POUR LESQUELS CE
PASSEPORT EST VALABLE*

**Valid for all Countries**

For Minister

The validity of this passport expires:      *Ce passeport expire le:*

SEP 0 3 2011

unless renewed.   *à mo...*

issued at
*délivré à*       SEP 3 2001

date
*date*            NASSAU, BAHAMAS

5.

OBSERVATIONS

**G Hume**

| | |
|---|---|
| **From:** | Casey Peterson |
| **Sent:** | Tuesday, February 09, 2010 1:38 PM |
| **To:** | G Hume |
| **Subject:** | Regulator Searches Gibraltar |
| **Attachments:** | Gibraltar 3rd Party Doc.pdf |



Home | Jobs | Fast Answers | Site Map | **Search**

**U.S. Securities and Exchange Commission**

About the SEC
Filings & Forms
Regulatory Actions
Staff Interps
Investor Info
News & Statements
Litigation
ALJ
Information for...
Divisions

### Search SEC documents

Search Terms: "Gibraltar Global Securities"          Advanced Search
                                                      Search Help

[x] Search                    [x] Reset

No results were found that matched your query. Please modify your query and try again.

*Last modified: 07/30/2009*

Contact | Employment | Links | FOIA | Forms | Privacy



Home | Jobs | Fast Answers | Site Map | **Search**

**U.S. Securities and Exchange Commission**

### Search SEC documents

About the SEC
Filings & Forms
Regulatory Actions
Staff Interps
Investor Info
News & Statements
Litigation
ALJ

Search Terms: "Warren Davis"          Advanced Search
                                        Search Help

[x] Search                    [x] Reset

**Showing results 1-1 of 1**

2/10/2010

Information for...

Divisions

Speech: Corporate Reorganizations Under the Backruptcy Act, September 23, 1937

Speech: Corporate Reorganizations Under the Backruptcy Act, September 23, 1937. Samuel O. Clark. Speech: Corporate Reorganizations Under the Backruptcy Act, September 23, 1937. I j 1 , ; ,I ti OURNALOFTHE NATIONAL ASSOCIATION of REFEREES IN BANKRUPTCY Organized Detroit, Michigan, July 9th and 10th, 1926 A QUARTERLY Vol. 12 OCTOBER, 1937 From Our President October 26, 1937. Fellow Referees: Another Conference has come and gone and for the most part a new group of officers, guided by our efficient and dependable Secretary, has taken over the affairs of our Association. Our branch of the law has become more and more specialized and complicated and only by organization can we best study the problems presented and attempt a greater uniformity of practice and better administration of our office. Those of us in the Association appreciate its helpfulness and realize the benefit of our JOURNAL and our Conferences, with the opportunity to meet for discussion with those engaged in the same

**Section:** News and Public Statements ¦ **Size:** 10,120 kb | **Type:** pdf ¦ **Date:** September 23, 1937

http://www.sec.gov/news/speech/1937/092337clark.pdf

Return to top

*Last modified: 04/30/2009*

Contact|Employment|Links|FOIA|Forms|Privacy

# OFAC Search Tool

## Search OFAC's Sanction Program Listings

Gibraltar Global Securities     Submit Query     Clear Search

Search for: the exact phrase

☑ Specially Designated Nationals (SDN)

☑ Palestinian Legislative Council (PLC)

- Each line should contain a separate name or phrase to search for in the OFAC Sanctions Program Listings.

- Your search will include all of the checked OFAC Listings.

- You may search for a maximum of 500 names or phrases at a time as shown in the example below:

  **John Andrew Doe**
  **Smith, George Q.**
  **Airways Charters, Inc.**

How to use this tool.

## Search Results

View the records below with your search term or terms highlighted. Using the highlighted list will allow you to quickly verify whether an entity or individual appears on the OFAC Sanctions Program Listings. **If you find a match or are in doubt about a specific account or transaction or you need additional information, contact OFAC's Compliance Hotline at 800-540-6322.**

Gibraltar Global Securities - 0 hit(s) click to expand

Warren Davis - 0 hit(s) click to expand

**Page:** 1

Data Updated: 02/09/2010 04:00:27

No virus found in this incoming message.
Checked by AVG - www.avg.com
Version: 8.5.435 / Virus Database: 271.1.1/2675 - Release Date: 02/09/10 07:35:00

2/10/2010

# BAHAMAS ELECTRICITY CORPORATION
P.O. BOX N 7509, NASSAU, BAHAMAS

ACCOUNTS AND GENERAL INQUIRIES: 322-2856
SUPPLY FAILURE: 920-3501 / FAMILY ISLAND LOCAL OFFICE

| SERVICE DATE FROM | TO | RATE CODE | METER READING CURRENT | PREVIOUS | METER ADVANCE | MULTIPLIER | KWH USAGE |
|---|---|---|---|---|---|---|---|
| 11/16/09 | 12/15/09 | NP/SC/I | 52,239 | 49,594 | 2,645 | 1.000 | 2,645 |

| CURRENT CHARGES | | | | CHARGES |
|---|---|---|---|---|
| MINIMUM CHARGE | | 35.00 | | 6.40 |
| KWH PER MONTH | .182800 | 2,610.00 | | 477.11 |
| FUEL SURCHARGE | .096203 | 2,645.00 | | 254.46 |

TOTAL OF CURRENT CHARGES                                               733.87

OTHER ADJUSTMENTS

PAST DUE AMOUNTS: BALANCE FROM PREVIOUS BILL

PAYMENTS DURING PERIOD:

| DATE PAID | AMOUNT PAID | DATE PAID | AMOUNT PAID |
|---|---|---|---|
| 12/18/09 | 818.33 | | |

SUPPLY MAY BE DISCONNECTED IF PAST DUE AMOUNT IS NOT PAID IMMEDIATELY

818.33

TOTAL PAYMENTS DURING PERIOD          818.33

TOTAL PAST DUE AMOUNT          .00

| ACCOUNT NUMBER | NAME | TOTAL AMOUNT DUE |
|---|---|---|
| 355013-634104 | GIBRALTAR GLOBAL SECURITIES | 733.87 |

| DEPOSIT HELD | SERVICE LOCATION |
|---|---|
| 2,470.00 | SANDYPORT UNIT#214 |

SUPPLY MAY BE DISCONNECTED IF CURRENT AMOUNT IS NOT PAID BY          1/26/10

| METER NUMBER | OLD ACCOUNT NUMBER |
|---|---|
| 909167 | |

Cycle-Route Numbers: 04-02

| USAGE COMPARISON | THIS YEAR | LAST YEAR |
|---|---|---|
| DAYS | 29 | 22 |
| PERIOD USAGE | 2645 | 1011.00 |
| DAILY AVERAGE | 91.21 | 45.95 |

**RECEIVED JAN 2 5 2010**

MESSAGE:

♦ DETACH ALONG PERFORATION AND RETURN BOTTOM PORTION WITH YOUR PAYMENT, PLEASE DO NOT FOLD, STAPLE OR CREASE. ♦

MAKE CHEQUE PAYABLE TO:

# BAHAMAS ELECTRICITY CORPORATION
P.O. BOX N 7509, NASSAU, BAHAMAS

FOR PROPER CREDIT TO YOUR ACCOUNT, PLEASE RETURN THIS PORTION WITH YOUR PAYMENT

GIBRALTAR GLOBAL SECURITIES
P O BOX SP63886
NASSAU
NASSAU, BAHAMAS NP SP638-86

| BILLING DATE |
|---|
| 1/05/10 |

| ACCOUNT NUMBER |
|---|
| 355013-634104 |

| SERVICE LOCATION |
|---|
| SANDYPORT UNIT#214 |

| AMOUNT DUE |
|---|
| 733.87 |

GIBRALTAR GLOBAL SECURITIES
P O BOX SP63886
NASSAU
NASSAU, BAHAMAS NP SP638-86

# Exhibit C



**Department of the Treasury
Internal Revenue Service
Appeals Office**
Appeals:MS 8000
4041 N. Central Ave, Suite 112
Phoenix, AZ 85012

Date:     AUG 0 6 2019

Person to contact:
  Name: Eric B Hughes
  Employee ID Number: 0359626
  Phone: 602-636-9435
  Fax: 602-636-9555
  Hours: 7:00 am - 4:00 pm MST
Re:

  Backup Withholding

Form Number:
  945
Tax periods ended:
  12/2011 12/2012
Taxpayer ID number:
  ▇▇▇▇▇▇▇

ALPINE SECURITIES CORPORATION
39 EXCHANGE PL
SALT LAKE CTY, UT 84111-2760

Dear ALPINE SECURITIES CORPORATION:

Unfortunately, we were unable to reach an agreement on your case. The Backup Withholding as determined by Appeals will be assessed and you will receive a Notice and Demand for payment of the tax, and interest owed.

If you would like to challenge our determination in court, you may file a complaint in the United States District Court or the United States Court of Federal Claims. If you decide to do this, you must first pay, at a minimum, for any one quarter and file a claim for refund of the tax. Once the claim for refund is denied or 6 months elapse without any action by the Service, you may initiate suit.

If you have any questions, please contact the person whose name and telephone number are shown above.

Thank you for your cooperation.

Sincerely,

**Gregory G. Butler**  Digitally signed by Gregory G. Butler
                                       Date: 2019.07.12 15:02:31 -05'00'

Gregory G. Butler
Appeals Team Manager

Enclosures:
Forms 4666 and 4668-B

cc: Paul K. Savage Esq.

Letter 4451 (Rev. 4-2018)
Catalog Number 52699R

## Department of the Treasury
**Internal Revenue Service**
**Director**

1973 N. Rulon White Blvd.
Ogden, UT 84201

Document Locator Number

29151-217-13501-19

IDRS Number: 6626854844
Notice Date: 08/05/2019
Name Control: ALPI

| MFT | Tax Period | Assessment Date | Trans Code |
|-----|-----------|-----------------|-----------|
| 16  | 201212    | 08/05/2019      | 370       |

Taxpayer Identifying Number ▶ ███████

Taxpayer

ALPINE SECURITIES CORPORATION
39 EXCHANGE PL
SALT LAKE CITY, UT 84111

Form Number: 945

Plan/Report Number:

Tax Period Ended: 12/31/2012

**Notice of Tax Due on Federal Tax Return**

This is a notice of tax due on your tax return identified above. Please pay the amount shown as Balance Due when you receive this notice. Make your check payable to the **United States Treasury** and send it with a copy of this notice to the address shown above. If the balance due as shown below is incorrect because you made a recent payment, please send us the amount you believe you owe and an explanation of the difference.

**The balance due may include penalty and interest. If you have any questions concerning the balance due or penalty and interest computation call us at 800-829-0115 (Business filers) or 800-829-8374 (individual filers).**

| 31. Reference | 32. TC | 33. Assessment | 34. Adjustment or Credit | 35. Balance Due |
|---------------|--------|----------------|--------------------------|-----------------|
| 08/05/2019 ADD'L TAX | 290 | 396,264.40 | | |
| 08/05/2019 INTEREST | 190 | 111,111.89 | | |

36. Reference Code: see enclosed notice

507,376.29

see enclosed notice

**Please return this copy with your payment to the address shown above**

Form **3552** (Rev. 1-2018) (Part 3)
Catalog Number 49356T

# Department of the Treasury

**Internal Revenue Service**
**Director**

1973 N. Rulon White Blvd.
Ogden, UT 84201

Document Locator Number

29151-217-13500-19

| MFT | Tax Period | Assessment Date | Trans Code |
|-----|-----------|-----------------|------------|
| 16 | 201112 | 08/05/2019 | 370 |

Taxpayer

ALPINE SECURITIES CORPORATION
39 EXCHANGE PL
SALT LAKE CITY, UT 84111

IDRS Number: 6626854844
Notice Date: 08/05/2019
Name Control: ALPI

Taxpayer
Identifying
Number                    ▶

Form Number:               945

Plan/Report Number:

Tax Period Ended:      12/31/2011

### Notice of Tax Due on Federal Tax Return

This is a notice of tax due on your tax return identified above. Please pay the amount shown as Balance Due when you receive this notice. Make your check payable to the **United States Treasury** and send it with a copy of this notice to the address shown above. If the balance due as shown below is incorrect because you made a recent payment, please send us the amount you believe you owe and an explanation of the difference.

**The balance due may include penalty and interest. If you have any questions concerning the balance due or penalty and interest computation call us at 800-829-0115 (Business filers) or 800-829-8374 (individual filers).**

| 31. Reference | 32. TC | 33. Assessment | 34. Adjustment or Credit | 35. Balance Due |
|---------------|--------|----------------|--------------------------|-----------------|
| 08/05/2019 ADD'L TAX | 290 | 1,099,234.36 | | |
| 08/05/2019 INTEREST | 190 | 351,095.31 | | |

36. Reference Code: see enclosed notice

1,450,329.67

see enclosed notice

**Please return this copy with your payment to the address shown above**

Form **3552** (Rev. 1-2018) (Part 3)
Catalog Number 49356T

# Exhibit D

| Form **843** | **Claim for Refund and Request for Abatement** | |
|---|---|---|
| (Rev. August 2011)<br>Department of the Treasury<br>Internal Revenue Service | ▶ **See separate instructions.** | OMB No. 1545-0024 |

Use Form 843 if your claim or request involves:

**(a)** a refund of one of the taxes (other than income taxes or an employer's claim for FICA tax, RRTA tax, or income tax withholding) or a fee, shown on line 3,

**(b)** an abatement of FUTA tax or certain excise taxes, or

**(c)** a refund or abatement of interest, penalties, or additions to tax for one of the reasons shown on line 5a.

Do **not** use Form 843 if your claim or request involves:

**(a)** an overpayment of income taxes or an employer's claim for FICA tax, RRTA tax, or income tax withholding (use the appropriate amended tax return),

**(b)** a refund of excise taxes based on the nontaxable use or sale of fuels, or

**(c)** an overpayment of excise taxes reported on Form(s) 11-C, 720, 730, or 2290.

| Name(s)<br>**Alpine Securities Corporation** | Your social security number |
|---|---|
| Address (number, street, and room or suite no.)<br>**39 Exchange Pl** | Spouse's social security number |
| City or town, state, and ZIP code<br>**Salt Lake City UT 84111** | Employer identification number (EIN)<br>█████████ |
| Name and address shown on return if different from above | Daytime telephone number |

| **1** | **Period.** Prepare a separate Form 843 for each tax period or fee year. | | | | **2** | **Amount** to be refunded or abated: |
|---|---|---|---|---|---|---|
| | From | **10-1-2012** | to | **12-31-2012** | | $ **66,947.72** |

**3** **Type of tax or fee.** Indicate the type of tax or fee to be refunded or abated or to which the interest, penalty, or addition to tax is related.

☐ Employment ☐ Estate ☐ Gift ☐ Excise ☑ Income ☐ Fee

**4** **Type of penalty.** If the claim or request involves a penalty, enter the Internal Revenue Code section on which the penalty is based (see instructions). IRC section: **3406**

**5a** **Interest, penalties, and additions to tax.** Check the box that indicates your reason for the request for refund or abatement. (If none apply, go to line 6.)

☐ Interest was assessed as a result of IRS errors or delays.

☐ A penalty or addition to tax was the result of erroneous written advice from the IRS.

☑ Reasonable cause or other reason allowed under the law (other than erroneous written advice) can be shown for not assessing a penalty or addition to tax.

**b** Date(s) of payment(s) ▶ _____ **September 2019**

**6** **Original return.** Indicate the type of fee or return, if any, filed to which the tax, interest, penalty, or addition to tax relates.

☐ 706 ☐ 709 ☐ 940 ☐ 941 ☐ 943 ☑ 945
☐ 990-PF ☐ 1040 ☐ 1120 ☐ 4720 ☐ Other (specify) ▶

**7** **Explanation.** Explain why you believe this claim or request should be allowed and show the computation of the amount shown on line 2. If you need more space, attach additional sheets.

The proposed tax/penalty assessment was supposed to be under consideration in the Appeals Office but before it was considered on its merits, an emergency assessment was made. The amount sought above represents one quarter's activity out of the 2011 and 2012 periods. See attached for additional information.

**Signature.** If you are filing Form 843 to request a refund or abatement relating to a joint return, both you and your spouse must sign the claim. Claims filed by corporations must be signed by a corporate officer authorized to sign, and the officer's title must be shown.

Under penalties of perjury, I declare that I have examined this claim, including accompanying schedules and statements, and, to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature (Title, if applicable. Claims by corporations must be signed by an officer.) _CFO_     Date _Nov 13, 2019_

Signature (spouse, if joint return) _____ Date _____

| **Paid Preparer Use Only** | Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|---|
| | Firm's name ▶ | | | Firm's EIN ▶ | |
| | Firm's address ▶ | | | Phone no. | |

For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.     Cat. No. 10180R     Form **843** (Rev. 8-2011)

# Exhibit E



Department of the Treasury
Internal Revenue Service
Ogden, UT 84201-0030

**IRS**



9307 1107 5620 7168 1919 96



006065.881196.448565.27086 2 AB 0.412 1234

ALPINE SECURITIES CORPORATION
% DAVID G CAZIER CFO
39 EXCHANGE PLACE
SALT LAKE CITY UT 84111-2760

006065

| | SB |
|---|---|
| Notice | CP504B |
| Tax period | December 31, 2011 |
| Form number | 945 |
| Notice date | January 6, 2020 |
| Employer ID number | ▮ |
| To contact us | Phone 800-829-0115 |
| Your Caller ID | 019544 |
| Page 1 of 6 | |

*870403873221*

## Notice of intent to seize (levy) your property or rights to property
# Amount due immediately: $1,508,726.08

This is a notice of intent to levy your property or rights to property.  As we notified you before, our records show you have unpaid taxes for the tax period ending December 31, 2011 (Form 945).  If you don't call us immediately to make payment arrangements or we don't receive the amount due within 30 days from the date of this notice, we may levy your property or rights to property and apply it to the $1,508,726.08 you owe.

## Billing Summary

| | |
|---|---|
| Amount you owed | $1,450,329.67 |
| Failure-to-pay penalty | 27,480.86 |
| Interest charges | 30,915.55 |
| **Amount due immediately** | **$1,508,726.08** |

Continued on back...



**IRS**

## Payment

ALPINE SECURITIES CORPORATION
% DAVID G CAZIER CFO
39 EXCHANGE PLACE
SALT LAKE CITY UT 84111-2760

| Notice | CP504B |
|---|---|
| Notice date | January 6, 2020 |
| Employer ID number | ▮ |

- Make your check or money order payable to the United States Treasury.
- Write your employer ID number (87-0403873), the tax period (December 31, 2011), and the form number (945) on your payment and any correspondence.

**Amount due immediately**    |    **$1,508,726.08**

INTERNAL REVENUE SERVICE
OGDEN, UT 84201-0039

870403873 ZY ALPI 16 2 201112 670 00150872608

| | SB |
|---|---|
| **Notice** | CP504B |
| **Tax Period** | December 31, 2011 |
| **Notice date** | January 6, 2020 |
| **Employer ID number** | |
| **Page 2 of 6** | |

## What you need to do immediately

**If you agree with the amount due and you're not working with an IRS representative**

- Pay the amount due of $1,508,726.08 immediately or we may file a Notice of Federal Tax Lien, the amount of interest will increase, and additional penalties may apply.
- Pay online or by phone, or mail a check or money order with the attached payment stub. You can pay online now at www.eftps.gov.

**If you disagree with the amount due**

Call us at 800-829-0115 to review your account with a representative. Be sure to have your account information available when you call. We'll assume you agree with the information in this notice if we don't hear from you.

## What you need to know

**Notice of Intent to Levy**

This notice is your Notice of Intent to Levy (Internal Revenue Code Section 6331(d)). If we don't receive the amount due within 30 days from the date of this notice, we may serve a Disqualified Employment Tax Levy or a Federal Contractor Levy, as explained in the enclosed Publication 594, IRS Collection Process. In most other situations, before we levy on your property or rights to property, we'll send you a notice that gives you the opportunity to request a Collection Due Process hearing, unless you have already received one.

Property or rights to property includes:
- Accounts receivable and other income
- Bank accounts
- Business assets

| | SB |
|---|---|
| **Notice** | CP504B |
| **Tax Period** | December 31, 2011 |
| **Notice date** | January 6, 2020 |
| **Employer ID number** | ▮▮▮▮▮ |
| **Page 3 of 6** | |

---

| What you need to know—**continued** | **Right to request an appeal** |
|---|---|

**Right to request an appeal**

If you don't agree with our intent to levy or file a Notice of Federal Tax Lien, you have the right to request an appeal under the Collection Appeals Program (CAP) before the collection action takes place. Please call 800-829-0115 or send us a Collection Appeal Request (Form 9423) to the address at the top of the notice within 30 days from the date of this notice. Note: The (CAP) is different from the Collection Due Process (CDP) Program. Please call 800-829-0115 if you have questions about either of these programs. For more information about your appeal rights, see Publication 1660 (Collection Appeal Rights).

**Denial or revocation of United States passport**

On December 4, 2015, as part of the Fixing America's Surface Transportation (FAST) Act, Congress enacted Section 7345 of the Internal Revenue Code, which requires the Internal Revenue Service to notify the State Department of taxpayers certified as owing a seriously delinquent tax debt. The FAST Act generally prohibits the State Department from issuing or renewing a passport to a taxpayer with seriously delinquent tax debt.

Seriously delinquent tax debt means an unpaid, legally enforceable federal tax debt of an individual totaling more than $52,000 that has been assessed and for which a Notice of Federal Tax Lien has been filed and all administrative remedies under IRC Section 6320 have lapsed or been exhausted, or a levy has been issued. If you are individually liable for tax debt (including penalties and interest) totaling more than $52,000 and you do not pay the amount you owe or make alternate arrangements to pay, we may notify the State Department that your tax debt is seriously delinquent. The State Department generally will not issue or renew a passport to you after we make this notification. If you currently have a valid passport, the State Department may revoke your passport or limit your ability to travel outside of the United States. Additional information on passport certification is available at www.irs.gov/passports.

---

**Payment options**

**Pay electronically**

The Electronic Federal Tax Payment System (EFTPS) is a free payment service for paying taxes online or by phone. To use EFTPS, you must enroll online at www.eftps.gov (registration may take up to 7 business days to take effect). You can pay from your bank account free of charge or by debit or credit card for a fee charged by the card processors, not the IRS. Visit www.irs.gov/payments to view all your options.

**Set up a payment plan**

If you can't pay the full amount you owe, pay as much as you can now and make arrangements with us to pay over an extended time. You may be able to set up a payment plan including an installment agreement. Visit www.irs.gov/opa to apply.

Businesses that owe $25,000 or less in assessed tax, penalty, and interest can also apply online for an in-Business Trust Fund Express installment agreement at www.irs.gov/tfeia.

**Consider an offer in compromise**

An offer in compromise allows you to settle your tax debt for less than the full amount you owe. For more information, visit www.irs.gov/offers.

Continued on back...

| | SB |
|---|---|
| **Notice** | CP504B |
| **Tax Period** | December 31, 2011 |
| **Notice date** | January 6, 2020 |
| **Employer ID number** | ████████ |
| **Page 4 of 6** | |

---

## Payment options—continued

**Payment history**

If you made payments through EFTPS, you can log on to your EFTPS account online to review payments you made by phone or online.

---

## If we don't hear from you

If you have not paid the debt already, a federal tax lien has arisen as a claim against all your property. If you don't pay the amount due immediately or make payment arrangements, we can file a Notice of Federal Tax Lien (NFTL) publicly establishing our priority with your creditors and we may levy (subject to any applicable Collection Due Process rights).

If we file the NFTL, it may be difficult to sell or borrow against your property. The NFTL may also appear on your credit report.

---

## Penalties

We are required by law to charge any applicable penalties.

### Failure-to-pay

| Description | Amount |
|---|---|
| **Total failure-to-pay** | **$27,480.86** |

We assess a 1/2% monthly penalty for not paying the tax you owe by the due date. We base the monthly penalty for paying late on the net unpaid tax at the beginning of each penalty month following the payment due date for that tax. This penalty applies even if you filed the return on time. We charge the penalty for each month or part of a month the payment is late; however, the penalty can't be more than 25% in total.

- The due date for the payment of the tax shown on a return generally is the return due date, without regard to extensions
- The due date for paying increases in tax is within 21 days of the date of our notice demanding payment (10 business days if the amount in the notice is $100,000 or more)

If we issue a Notice of Intent to Levy and you don't pay the balance due within 10 days of the date of the notice, the penalty for paying late increases to 1% per month.

For sole proprietors who filed on time, the penalty decreases to 1/4% per month while an approved installment agreement with the IRS is in effect for payment of that tax. (Internal Revenue Code Section 6651)

For a detailed calculation of your penalty charges, call 800-829-0115.

| | SB |
|---|---|
| **Notice** | CP504B |
| **Tax Period** | December 31, 2011 |
| **Notice date** | January 6, 2020 |
| **Employer ID number** | |
| **Page 5 of 6** | |



006065

## Penalties—continued

| | |
|---|---|
| **Removal or reduction of penalties** | We understand that circumstances—such as serious illness or injury, a family member's death, or loss of financial records due to natural disaster—may make it difficult for you to meet your taxpayer responsibility in a timely manner.

We can generally process your request for penalty removal or reduction quicker if you contact us at the number listed above with the following information:
• Identify which penalty charges you would like us to reconsider (e.g., 2016 late filing penalty).
• For each penalty charge, explain why you believe it should be reconsidered.
If you write us, include a signed statement and supporting documentation for penalty abatement request.

We'll review your request and let you know whether we accept your explanation as reasonable cause to reduce or remove the penalty charge(s).

You may qualify to have certain penalties removed based on a clean history. For more information visit the IRS on the web at www.irs.gov and search for key words "first time abate." |
| **Removal of penalties due to erroneous written advice from the IRS** | If you were penalized based on written advice from the IRS, we will remove the penalty if you meet the following criteria:
• You wrote us asking for advice on a specific issue
• You gave us adequate and accurate information
• You received written advice from us
• You reasonably relied on our written advice and were penalized based on that advice

To request removal of penalties based on erroneous written advice from us, submit a completed Claim for Refund and Request for Abatement (Form 843) to the address shown above. For a copy of the form, go to www.irs.gov or call 800-TAX-FORM (800-829-3676). |
| **Interest charges** | We are required by law to charge interest when you do not pay your liability on time. Generally, we calculate interest from the due date of your return (regardless of extensions) until you pay the amount you owe in full, including accrued interest and any penalty charges. Interest on some penalties accrues from the date we notify you of the penalty until it is paid in full. Interest on other penalties, such as failure to file a tax return, starts from the due date or extended due date of the return. Interest rates are variable and may change quarterly. (Internal Revenue Code Section 6601) |

| Description | Amount |
|---|---|
| **Total interest** | **$30,915.55** |

The table below shows the rates used to calculate the interest on your unpaid amount due. For a detailed calculation of your interest, call 800-829-0115.

| | Period | Interest Rate |
|---|---|---|
| **Tax interest rates** | October 1, 2011 through December 31, 2011 | 3% |
| | January 1, 2012 through March 31, 2012 | 3% |

Continued on back...

| | SB |
|---|---|
| Notice | CP504B |
| Tax Period | December 31, 2011 |
| Notice date | January 6, 2020 |
| Employer ID number | ▬▬▬ |
| Page 6 of 6 | |

## Interest charges—continued

**Tax interest rates**

| Period | Interest Rate |
|---|---|
| April 1, 2012 through June 30, 2012 | 3% |
| July 1, 2012 through September 30, 2012 | 3% |
| October 1, 2012 through December 31, 2012 | 3% |
| January 1, 2013 through March 31, 2013 | 3% |
| April 1, 2013 through June 30, 2013 | 3% |
| July 1, 2013 through September 30, 2013 | 3% |
| October 1, 2013 through December 31, 2013 | 3% |
| January 1, 2014 through March 31, 2014 | 3% |
| April 1, 2014 through June 30, 2014 | 3% |
| July 1, 2014 through September 30, 2014 | 3% |
| October 1, 2014 through December 31, 2014 | 3% |
| January 1, 2015 through March 31, 2015 | 3% |
| April 1, 2015 through June 30, 2015 | 3% |
| July 1, 2015 through September 30, 2015 | 3% |
| October 1, 2015 through December 31, 2015 | 3% |
| January 1, 2016 through March 31, 2016 | 3% |
| April 1, 2016 through June 30, 2016 | 4% |
| July 1, 2016 through September 30, 2016 | 4% |
| October 1, 2016 through December 31, 2016 | 4% |
| January 1, 2017 to March 31, 2018 | 4% |
| Beginning April 1, 2018 | 5% |

## Additional information

- Visit www.irs.gov/cp504b
- You may find the following publications helpful:
  - Publication 1, Your Rights as a Taxpayer
  - Publication 1660, Collection Appeal Rights
- For tax forms, instructions, and publications, visit www.irs.gov/forms-pubs or call 800-TAX-FORM (800-829-3676).
- Review the enclosed IRS Collection Process (Publication 594).
- Paying online is convenient, secure, and ensures timely receipt of your payment. To pay your taxes online or for more information, go to www.eftps.gov.
- You can contact us by mail at the following address. Be sure to include your employer ID number, the tax year, and the form number you are writing about.
  Internal Revenue Service
  Ogden, UT 84201-0039
- Generally, we deal directly with taxpayers or their authorized representatives. However, occasionally we need to speak with other people, such as employees, employers, banks, or neighbors to gather or verify account information. If we contact a third party, the law prohibits us from sharing any more information than is necessary to obtain or verify what we need to know. You have the right to request a list of individuals we contact about your account.
- Keep this notice for your records.

If you need assistance, please don't hesitate to contact us.



Department of the Treasury
Internal Revenue Service
Ogden, UT 84201-0030

**IRS**



9307 1107 5620 7168 1920 09

006066.881196.448565.27086 2 AB 0.412 1234

ALPINE SECURITIES CORPORATION
% DAVID G CAZIER CFO
39 EXCHANGE PLACE
SALT LAKE CITY UT 84111-2760

106066

| | SB |
|---|---|
| **Notice** | CP504B |
| **Tax period** | December 31, 2012 |
| **Form number** | 945 |
| **Notice date** | January 6, 2020 |
| **Employer ID number** | |
| **To contact us** | Phone 800-829-0115 |
| **Your Caller ID** | 019544 |
| **Page 1 of 6** | |



*870403873221*

## Notice of intent to seize (levy) your property or rights to property
# Amount due immediately: $458,711.50

This is a notice of intent to levy your property or rights to property.  As we notified you before, our records show you have unpaid taxes for the tax period ending December 31, 2012 (Form 945).  If you don't call us immediately to make payment arrangements or we don't receive the amount due within 30 days from the date of this notice, we may levy your property or rights to property and apply it to the $458,711.50 you owe.

### Billing Summary

| | |
|---|---|
| Amount you owed | $440,428.57 |
| Failure-to-pay penalty | 8,567.65 |
| Interest charges | 9,715.28 |
| **Amount due immediately** | **$458,711.50** |

Continued on back...



**IRS**

# Payment

ALPINE SECURITIES CORPORATION
% DAVID G CAZIER CFO
39 EXCHANGE PLACE
SALT LAKE CITY UT 84111-2760

| **Notice** | CP504B |
|---|---|
| **Notice date** | January 6, 2020 |
| **Employer ID number** | 87-0403873 |

- Make your check or money order payable to the United States Treasury.
- Write your employer ID number (87-0403873), the tax period (December 31, 2012), and the form number (945) on your payment and any correspondence.

**Amount due immediately**      $458,711.50

INTERNAL REVENUE SERVICE
OGDEN, UT 84201-0039

870403873 ZY ALPI 16 2 201212 670 00045871150

| | SB |
|---|---|
| Notice | CP504B |
| Tax Period | December 31, 2012 |
| Notice date | January 6, 2020 |
| Employer ID number | |
| Page 2 of 6 | |

## What you need to do immediately

**If you agree with the amount due and you're not working with an IRS representative**

- Pay the amount due of $458,711.50 immediately or we may file a Notice of Federal Tax Lien, the amount of interest will increase, and additional penalties may apply.
- Pay online or by phone, or mail a check or money order with the attached payment stub. You can pay online now at www.eftps.gov.

**If you disagree with the amount due**

Call us at 800-829-0115 to review your account with a representative. Be sure to have your account information available when you call. We'll assume you agree with the information in this notice if we don't hear from you.

## What you need to know

**Notice of Intent to Levy**

This notice is your Notice of Intent to Levy (Internal Revenue Code Section 6331(d)). If we don't receive the amount due within 30 days from the date of this notice, we may serve a Disqualified Employment Tax Levy or a Federal Contractor Levy, as explained in the enclosed Publication 594, IRS Collection Process. In most other situations, before we levy on your property or rights to property, we'll send you a notice that gives you the opportunity to request a Collection Due Process hearing, unless you have already received one.

Property or rights to property includes:
- Accounts receivable and other income
- Bank accounts
- Business assets

| | SB |
|---|---|
| Notice | CP504B |
| Tax Period | December 31, 2012 |
| Notice date | January 6, 2020 |
| Employer ID number | ████████ |
| Page 3 of 6 | |



006066

## What you need to know—continued

### Right to request an appeal

If you don't agree with our intent to levy or file a Notice of Federal Tax Lien, you have the right to request an appeal under the Collection Appeals Program (CAP) before the collection action takes place. Please call 800-829-0115 or send us a Collection Appeal Request (Form 9423) to the address at the top of the notice within 30 days from the date of this notice. Note: The (CAP) is different from the Collection Due Process (CDP) Program. Please call 800-829-0115 if you have questions about either of these programs. For more information about your appeal rights, see Publication 1660 (Collection Appeal Rights).

### Denial or revocation of United States passport

On December 4, 2015, as part of the Fixing America's Surface Transportation (FAST) Act, Congress enacted Section 7345 of the Internal Revenue Code, which requires the Internal Revenue Service to notify the State Department of taxpayers certified as owing a seriously delinquent tax debt. The FAST Act generally prohibits the State Department from issuing or renewing a passport to a taxpayer with seriously delinquent tax debt.

Seriously delinquent tax debt means an unpaid, legally enforceable federal tax debt of an individual totaling more than $52,000 that has been assessed and for which a Notice of Federal Tax Lien has been filed and all administrative remedies under IRC Section 6320 have lapsed or been exhausted, or a levy has been issued. If you are individually liable for tax debt (including penalties and interest) totaling more than $52,000 and you do not pay the amount you owe or make alternate arrangements to pay, we may notify the State Department that your tax debt is seriously delinquent. The State Department generally will not issue or renew a passport to you after we make this notification. If you currently have a valid passport, the State Department may revoke your passport or limit your ability to travel outside of the United States. Additional information on passport certification is available at www.irs.gov/passports.

## Payment options

### Pay electronically

The Electronic Federal Tax Payment System (EFTPS) is a free payment service for paying taxes online or by phone. To use EFTPS, you must enroll online at www.eftps.gov (registration may take up to 7 business days to take effect). You can pay from your bank account free of charge or by debit or credit card for a fee charged by the card processors, not the IRS. Visit www.irs.gov/payments to view all your options.

### Set up a payment plan

If you can't pay the full amount you owe, pay as much as you can now and make arrangements with us to pay over an extended time. You may be able to set up a payment plan including an installment agreement. Visit www.irs.gov/opa to apply.

Businesses that owe $25,000 or less in assessed tax, penalty, and interest can also apply online for an in-Business Trust Fund Express installment agreement at www.irs.gov/tfeia.

### Consider an offer in compromise

An offer in compromise allows you to settle your tax debt for less than the full amount you owe. For more information, visit www.irs.gov/offers.

Continued on back...

| | SB |
|---|---|
| **Notice** | CP504B |
| **Tax Period** | December 31, 2012 |
| **Notice date** | January 6, 2020 |
| **Employer ID number** | ████████ |
| **Page 4 of 6** | |

---

**Payment options—continued**

**Payment history**

If you made payments through EFTPS, you can log on to your EFTPS account online to review payments you made by phone or online.

---

**If we don't hear from you**

If you have not paid the debt already, a federal tax lien has arisen as a claim against all your property. If you don't pay the amount due immediately or make payment arrangements, we can file a Notice of Federal Tax Lien (NFTL) publicly establishing our priority with your creditors and we may levy (subject to any applicable Collection Due Process rights).

If we file the NFTL, it may be difficult to sell or borrow against your property. The NFTL may also appear on your credit report.

---

**Penalties**

We are required by law to charge any applicable penalties.

**Failure-to-pay**

| Description | Amount |
|---|---|
| **Total failure-to-pay** | **$8,567.65** |

We assess a 1/2% monthly penalty for not paying the tax you owe by the due date. We base the monthly penalty for paying late on the net unpaid tax at the beginning of each penalty month following the payment due date for that tax. This penalty applies even if you filed the return on time. We charge the penalty for each month or part of a month the payment is late; however, the penalty can't be more than 25% in total.

- The due date for the payment of the tax shown on a return generally is the return due date, without regard to extensions
- The due date for paying increases in tax is within 21 days of the date of our notice demanding payment (10 business days if the amount in the notice is $100,000 or more)

If we issue a Notice of Intent to Levy and you don't pay the balance due within 10 days of the date of the notice, the penalty for paying late increases to 1% per month.

For sole proprietors who filed on time, the penalty decreases to 1/4% per month while an approved installment agreement with the IRS is in effect for payment of that tax. (Internal Revenue Code Section 6651)

For a detailed calculation of your penalty charges, call 800-829-0115.

| | SB |
|---|---|
| Notice | CP504B |
| Tax Period | December 31, 2012 |
| Notice date | January 6, 2020 |
| Employer ID number | |
| Page 5 of 6 | |



J06066

## Penalties—continued

**Removal or reduction of penalties**

We understand that circumstances—such as serious illness or injury, a family member's death, or loss of financial records due to natural disaster—may make it difficult for you to meet your taxpayer responsibility in a timely manner.

We can generally process your request for penalty removal or reduction quicker if you contact us at the number listed above with the following information:
- Identify which penalty charges you would like us to reconsider (e.g., 2016 late filing penalty).
- For each penalty charge, explain why you believe it should be reconsidered. If you write us, include a signed statement and supporting documentation for penalty abatement request.

We'll review your request and let you know whether we accept your explanation as reasonable cause to reduce or remove the penalty charge(s).

You may qualify to have certain penalties removed based on a clean history. For more information visit the IRS on the web at www.irs.gov and search for key words "first time abate."

**Removal of penalties due to erroneous written advice from the IRS**

If you were penalized based on written advice from the IRS, we will remove the penalty if you meet the following criteria:
- You wrote us asking for advice on a specific issue
- You gave us adequate and accurate information
- You received written advice from us
- You reasonably relied on our written advice and were penalized based on that advice

To request removal of penalties based on erroneous written advice from us, submit a completed Claim for Refund and Request for Abatement (Form 843) to the address shown above. For a copy of the form, go to www.irs.gov or call 800-TAX-FORM (800-829-3676).

**Interest charges**

We are required by law to charge interest when you do not pay your liability on time. Generally, we calculate interest from the due date of your return (regardless of extensions) until you pay the amount you owe in full, including accrued interest and any penalty charges. Interest on some penalties accrues from the date we notify you of the penalty until it is paid in full. Interest on other penalties, such as failure to file a tax return, starts from the due date or extended due date of the return. Interest rates are variable and may change quarterly. (Internal Revenue Code Section 6601)

| Description | Amount |
|---|---|
| **Total interest** | **$9,715.28** |

The table below shows the rates used to calculate the interest on your unpaid amount due. For a detailed calculation of your interest, call 800-829-0115.

**Tax interest rates**

| Period | Interest Rate |
|---|---|
| October 1, 2012 through December 31, 2012 | 3% |
| January 1, 2013 through March 31, 2013 | 3% |

Continued on back...

| | SB |
|---|---|
| Notice | CP504B |
| Tax Period | December 31, 2012 |
| Notice date | January 6, 2020 |
| Employer ID number | ▮▮▮▮▮▮ |
| Page 6 of 6 | |

## Interest charges—continued

**Tax interest rates**

| Period | Interest Rate |
|---|---|
| April 1, 2013 through June 30, 2013 | 3% |
| July 1, 2013 through September 30, 2013 | 3% |
| October 1, 2013 through December 31, 2013 | 3% |
| January 1, 2014 through March 31, 2014 | 3% |
| April 1, 2014 through June 30, 2014 | 3% |
| July 1, 2014 through September 30, 2014 | 3% |
| October 1, 2014 through December 31, 2014 | 3% |
| January 1, 2015 through March 31, 2015 | 3% |
| April 1, 2015 through June 30, 2015 | 3% |
| July 1, 2015 through September 30, 2015 | 3% |
| October 1, 2015 through December 31, 2015 | 3% |
| January 1, 2016 through March 31, 2016 | 3% |
| April 1, 2016 through June 30, 2016 | 4% |
| July 1, 2016 through September 30, 2016 | 4% |
| October 1, 2016 through December 31, 2016 | 4% |
| January 1, 2017 to March 31, 2018 | 4% |
| Beginning April 1, 2018 | 5% |

## Additional information

- Visit www.irs.gov/cp504b
- You may find the following publications helpful:
  - Publication 1, Your Rights as a Taxpayer
  - Publication 1660, Collection Appeal Rights
- For tax forms, instructions, and publications, visit www.irs.gov/forms-pubs or call 800-TAX-FORM (800-829-3676).
- Review the enclosed IRS Collection Process (Publication 594).
- Paying online is convenient, secure, and ensures timely receipt of your payment. To pay your taxes online or for more information, go to www.eftps.gov.
- You can contact us by mail at the following address. Be sure to include your employer ID number, the tax year, and the form number you are writing about.
  Internal Revenue Service
  Ogden, UT 84201-0039
- Generally, we deal directly with taxpayers or their authorized representatives. However, occasionally we need to speak with other people, such as employees, employers, banks, or neighbors to gather or verify account information. If we contact a third party, the law prohibits us from sharing any more information than is necessary to obtain or verify what we need to know. You have the right to request a list of individuals we contact about your account.
- Keep this notice for your records.

If you need assistance, please don't hesitate to contact us.